702 P.2d 620 (1985)
S.M.K. and A.M.K., Appellants,
v.
R.G.G., Appellee.
No. S-460.
Supreme Court of Alaska.
June 14, 1985.
Michael G. Briggs, Ely, Guess & Rudd, Anchorage, for appellants.
Janet D. Platt, Bendell, Bendell & Platt, Anchorage, for appellee.
Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

OPINION
BURKE, Justice.
The single issue presented in this appeal is whether the superior court erred in affirming a master's report which recommended denial of a petition for adoption of child by S.M.K. and A.M.K. The petition for adoption was denied on the ground that the natural mother, R.G.G., did not consent to the adoption. We affirm the superior court's decision.

BACKGROUND
The child, S. [hereinafter referred to as "Stuart"],[1] was born on March 2, 1979, to mother R.G.G. ["Ruth"] and father D.R.G. ["Dennis"], and lived with his parents in Phenix City, Alabama, for the first year of *621 his life. Shortly after Stuart's first birthday, Ruth and Dennis experienced marital difficulty. In late May, 1980, following an argument, Dennis left the family home without advising Ruth of his plans, and went to his mother's residence in Seale, Alabama, taking Stuart with him. Later that day, when Ruth went to her mother-inlaw's [Mrs. Willis's] house to see if Stuart was there, she was denied entry into the house. When she tried to force her way through the door, her mother-in-law pulled a gun and told her to leave.
Ruth sought help from the sheriff's office in the return of her son. She was informed that the sheriff could not help her unless she had a custody order. Ruth secured a temporary custody order from an Alabama Circuit Court, awarding her custody of Stuart pending further order of the court. When the sheriff arrived at Mrs. Willis's home to enforce the custody order, Mrs. Willis informed the sheriff that Stuart was not there and that she did not know where either the child or the father were. Ruth testified that she went to Mrs. Willis's home every day for the following two weeks hoping to see her child, and checked with friends to see if anyone had seen her husband or Stuart. Her attorney advised her that there was nothing she could do until she located her child. Ruth left the family home and moved in with her sister, because she could not afford to pay the rent on the house.
In the hearing of this case, Mrs. Willis admitted that Dennis and Stuart had stayed with her for approximately one week after leaving Ruth, and that Dennis left with Stuart when he learned that Ruth had commenced a custody proceeding. She also admitted that she knew Dennis and Stuart were heading to the Houston, Texas, area and that they would be in touch with relatives. Dennis and Mrs. Willis both testified that they had decided it was best that Mrs. Willis not know exactly where Dennis and Stuart were living, because Mrs. Willis would be pressured to tell the authorities and Ruth. Dennis admitted that he had learned of the Alabama court order within two weeks of its issuance.
Dennis first went to live in Pasedena, Texas, with his aunt and uncle, whom Ruth had never met. Dennis admits that he made no effort to contact Ruth for the next year and a half, aside from sending three postcards without a return address,[2] because he did not know what he wanted to do and did not want a custody squabble.
Stuart lived with Dennis for approximately a year, until the summer of 1981, when Dennis sent Stuart to live with Mrs. Willis, who had moved to Houston, Texas. Less than six months thereafter, A.M.K. ["Anne Kaye"] and S.M.K. ["Sam Kaye"], the appellants, were contacted in Alaska and were asked to take custody of Stuart. Anne Kaye is Dennis's sister, and Sam Kaye is Anne Kaye's husband. The Kayes agreed, and in February, 1982, they removed Stuart from Texas and brought him to Alaska. Anne Kaye testified that at the time she gained possession of Stuart, she was aware of the Alabama court order which granted temporary custody of Stuart to his mother, but that she did not believe she was violating that order when she brought Stuart to Alaska. Anne Kaye further testified that even if she knew in February, 1982, where Ruth was, she would have kept Stuart rather than return him to his mother. Stuart resided with the Kayes in Alaska from February, 1982, until April, 1984, when the superior court ordered that he be returned to his mother.
Ruth testified that her first contact with Dennis after he left Alabama occurred in the spring of 1982, more than 1½ years after he had left with Stuart, and when Stuart was presumably already in Alaska. According to Ruth, Dennis telephoned stating that he wanted a divorce so that he could marry his girlfriend. Ruth agreed, if Dennis would allow Stuart to live with her. Dennis refused, and informed Ruth that *622 Stuart wasn't living with him and that he wasn't sure where he was. Dennis gave Ruth his phone number. Later that evening Ruth called Dennis and the return of Stuart was discussed again, to no avail.
Ruth testified that when she went to call Dennis the following day, she was unable to find the piece of paper upon which she had written Dennis's phone number. The only other information Dennis had given her was that he was living with his girlfriend in Brownsville, Texas. Ruth stated that she called information to secure a listing under Dennis' name but no such listing existed. Ruth further testified that in her attempts to locate Dennis, she contacted the county welfare office and Alabama Legal Aid for assistance. Her search was in vain. Dennis testified at trial that he had never lived in Brownsville, Texas.[3]
Ruth's next contact regarding Stuart was a registered letter she received from the Kayes dated July 10, 1982. The letter simply informed Ruth that Stuart was living with the Kayes at the described address and telephone number. It offered Ruth neither explanation nor hope that Stuart would be returned to her. Anne Kaye testified that the letter was sent only on the advice of legal counsel.
Ruth testified that upon receiving the letter she decided not to attempt to communicate with Stuart through the Kayes because she did not believe that the Kayes would give any of her letters to Stuart. She also felt that Stuart was too young to understand what was going on. Stuart was then 3 years old, and had not seen his real mother, Ruth, for more than two of those years. Ruth spoke with several attorneys who advised her that the only way to secure custody of her son was to fly to Alaska herself or retain counsel in Alaska. Ruth testified that at that point she started to save what she could to travel to Alaska.[4]
Some eight months later, in March of 1983, the Kayes sent Ruth a consent to adoption form without cover letter or explanation.[5] Ruth contacted the office of the judge who had issued the temporary custody order and was advised to contact an attorney. Ruth spoke with her attorney but was advised that the best thing she could do was to go to Alaska.
Within two days of receiving the consent form, Ruth wrote to the superior court in Alaska, enclosing a copy of the consent form as well as a copy of the Alabama court order. Ruth advised the court that she had known for about six months that her son was in Alaska. She stated that she wanted him back but that she did not have the money to travel to Alaska and bring him home. She asked that the court not grant the adoption and requested help in returning her son.
On April 4, 1983, the Probate Master responded to Ruth's letter, stating that no adoption petition had yet been filed and that an adoption could not be granted in any case without notice to Ruth of a hearing. The Probate Master suggested that the matter would drop since Ruth did not consent to the adoption.
The Kayes filed their petition to adopt the then four year old Stuart on August 5, 1983. The court appointed counsel for Ruth on October 20, 1983.
*623 On March 19, 1984, Ruth filed a motion to enforce the Alabama custody decree, a writ of assistance, a motion to dismiss the petition for adoption, and a motion to consolidate all related proceedings. The motion to consolidate was granted on March 20, 1984.
After a full evidentiary hearing, the master filed her report recommending that the Kayes' petition for adoption be dismissed, that Ruth's motion to enforce the custody order be granted, and that Ruth be awarded immediate custody of Stuart, with transportation paid for and arranged by the Kayes. The superior court issued an order adopting the master's findings and recommendations as its own. It is from that order that this appeal is taken.

Right of a Natural Parent to Consent to the Adoption of His or Her Child
The single issue on appeal is whether the superior court erred in finding that Ruth's consent was necessary before the court could authorize Stuart's adoption. AS 25.23.040(a) establishes that a natural parent's consent to adoption is required unless a statutory exception applies.[6] The exception the Kayes maintain applies here is that Ruth "failed significantly without justifiable cause" to "communicate meaningfully" with Stuart for at least one year, while Stuart was in the custody of another. AS 25.23.050(a)(2)(A).[7] Ruth admits that she failed to communicate with her child, Stuart, from May, 1980, when Stuart was surreptitiously taken from her, through August, 1983, when the Kayes filed their petition for adoption. The Kayes maintain that the superior court erred in concluding that Ruth's non-communication was justifiable in the circumstances.
Both parties agree that the dispute in this case is factual.[8] Therefore, we may interfere with the superior court's order only if we find that the master's findings are "clearly erroneous."[9]
We note that the superior court was obliged to strictly construe AS 25.23.050[10] in favor of the natural parent. R.N.T. v. J.R.G., 666 P.2d 1036, 1039 (Alaska 1983). This court has on numerous occasions repeated that:
[A]doption consent provisions are designed to protect the natural rights of parents to custody, society, comfort, and services of the child... . [P]arents should not be deprived of the fundamental rights and duties inherent in the parent-child *624 relationship except for "grave and weighty reasons."
D.L.J. v. W.D.R., 635 P.2d 834, 837 (Alaska 1981), citing In re Adoption of K.M.M., 611 P.2d 84, 87 (Alaska 1980). See In re Adoption of L.A.H., 597 P.2d 513, 516 n. 8 (Alaska 1979); Delgado v. Fawcett, 515 P.2d 710, 712 (Alaska 1973), interpreting former AS 20.15.040. In addition, the adoptive parents had the burden of proving by clear and convincing evidence that the natural parent's omissions were not justified.[11]See R.N.T. v. J.R.G., 666 P.2d 1036, 1037 n. 1 (Alaska 1983); D.L.J. v. W.D.R., 635 P.2d 834, 839 (Alaska 1981).
The master concluded that Ruth's non-communication with Stuart from July, 1982, when Ruth became aware of Stuart's location in Alaska, until August, 1983, when the petition for adoption was filed, was justified for a number of reasons. Foremost, Ruth had been wrongfully denied meaningful access to her child, Stuart, by Dennis or his family for three years, since shortly after Stuart's first birthday.
Ruth had no way to communicate with Stuart from June, 1980 through July, 1982 because she was unable to locate Stuart due to actions taken by Dennis or his family. Although in July, 1982, the Kayes notified Ruth of Stuart's location in Alaska, they deprived Ruth of physical access to her child, because Ruth had no financial ability to either travel to Alaska or to retain counsel to assist her in enforcing the Alabama custody order. Without such physical access, the master found that Ruth could not have meaningful access to Stuart. At the time Ruth learned of his location in Alaska, Stuart was three years old. The master concluded it was not unreasonable for Ruth to believe that Stuart was too young to remember Ruth as his mother or to understand what was happening, that neither written nor telephonic communication would result in meaningful contact for either of them, and that such communication would probably be seriously disruptive to Stuart. The master also found that, given the Kayes' apparent intent to keep Stuart from his mother, it was reasonable for Ruth to believe that she would have the best chance of resuming meaningful contact with or custody of her child by physically coming to Alaska, once she could afford to do so. Based upon these findings, the master concluded that Ruth's failure to communicate with Stuart was justified.
We uphold the master's findings. Given the behavior of Dennis's family and Ruth's limited resources, Ruth, unfortunately, was effectively denied the means to communicate with her son. Ruth showed her interest in preserving her relationship with Stuart by seeking the assistance of both the Alabama and Alaska courts, as well as several attorneys. These efforts were reasonable and practical given the facts of this case.
The Kayes argue on appeal that the findings are clearly erroneous. They maintain that Ruth's barriers to communication were not insurmountable, and that this is evidenced by the fact that Dennis left Ruth his phone number (after a year and a half had passed) and Ruth lost it. While it is unfortunate that the number was misplaced, it seems unlikely that the phone number would have lessened the barrier to communication with Stuart at that point. The Kayes also point to the fact that Ruth *625 learned of Stuart's location in Alaska in July, 1982, and are incensed that even then Ruth "made not one phone call, wrote not one letter, sent not one birthday, Christmas or Valentine's Day card or even one modest gift to the child Stuart." We agree with the master that Ruth reasonably concluded that letters and telephone calls would not have resulted in meaningful communication between Ruth and Stuart at that point, given the child's young age and the period of time that had passed since Stuart last saw his mother.
The Kayes maintain that Ruth's behavior shows that she was not interested in preserving a parental relationship with Stuart. They point to Mrs. Willis's alleged contact with Ruth in 1981 in which Ruth allegedly did not ask about her child Stuart or seek to ascertain his whereabouts. Ruth maintains this conversation never occurred. The master found Ruth's testimony more credible than Mrs. Willis's, and we defer to the master's judgment as to the credibility of witnesses.
Finally, the Kayes challenge the master's reliance on the "subjective" evidence of Ruth's reasons for failing to communicate with her son Stuart. When similar challenges have been raised in the past, this court has held that:
[e]vidence of subjective intent may be admitted to show what the "cause" for a parent's course of action was, but whether the cause was justifiable must turn on the court's determination of what grounds are objectively acceptable.
D.L.J. v. W.D.R., 635 P.2d 834, 839 (Alaska 1981). The master in this case did not improperly rely on Ruth's subjective intent.
In sum, we hold that the master's findings are amply supported in the record and in no way could be considered clearly erroneous. Further, we are astonished that the Kayes could plea to this court the "unjustified" actions of Stuart's mother, when it was the Kayes and other members of Dennis's family who collaborated to wrongfully deny Stuart access to his mother during Stuart's first few years of life. To hold that Ruth's failure to communicate was not justifiable in these circumstances would only serve to encourage the obstruction of court-ordered custody rights, and trap the indigent parent. See In re Adoption of A.J.N., 525 P.2d 520, 523 (Alaska 1974).
Accordingly, we AFFIRM.
NOTES
[1] Because the real names of the litigants have been sealed in order to preserve anonymity, we have substituted fictitious names. The fictitious names have no relation to the real names of the litigants.
[2] Dennis stated that within a week after his arrival in Texas, he mailed Ruth three postcards advising her of Stuart's safety. He did not advise her, however, of the child's location or where he could be contacted. Ruth claims never to have received the postcards.
[3] Mrs. Willis claims to have travelled from Texas to Alabama in the spring of 1981 to locate Ruth. She claims to have spoken with Ruth during that visit, and concluded that Ruth did not want Stuart back. Ruth denies that any such conversation ever took place.
[4] Ruth has been unemployed since the birth of her second son in June, 1982. Her only sources of income since that time consist of a welfare payment of $169.00 per month and food stamps. Her monthly expenditures, during that time and currently, consist of rent in the amount of $100.00 per month, electricity, $20.00 per month, laundry, baby clothes, diapers and other miscellaneous expenses of $34.00 per month. Ruth testified that she has about $15.00 left over each month after the above expenses are paid. She receives no assistance from the father of her second child. Ruth has not completed her high school education and she earned her highest wage of $3.25 per hour as a restaurant employee in 1982.

Ruth testified that she never paid for any of the attorney consultations.
[5] The natural father, Dennis, consented to the adoption.
[6] The law is clear that "[t]he best interests of the child are not relevant to a determination of whether a natural parent's consent can be dispensed with by the court." D.L.J. v. W.D.R., 635 P.2d 834, 838 (Alaska 1981). "The statutory scheme for adoption contemplates a separate determination of whose consent must be obtained before the merits of a petition for adoption are considered." Id. In re Adoption of L.A.H., 597 P.2d 513, at 517 n. 12 (Alaska 1979); In re Adoption of K.S., 543 P.2d 1191, 1194 (Alaska 1975).
[7] AS 25.23.050 provides:

Persons as to whom consent and notice not required. (a) Consent to adoption is not required of
(1) for purposes of this section, a parent who has abandoned a child for not less than six months;
(2) a parent of a child in the custody of another, if the parent for a period of at least one has failed significantly without justifiable cause, including but not limited to indigency,
(A) to communicate meaningfully with the child, or
(B) to provide for the care and support of the child as required by law or judicial decree... .
[8] No questions of law, such as what are proper considerations for finding justifiable cause, are raised. See R.N.T. v. J.R.G., 666 P.2d 1036, 1038 (Alaska 1983). Appellants do not argue that the facts considered by the master were inappropriate, or that they did not establish "justifiable cause." They argue that the evidence does not support the factual findings.
[9] The superior court must accept the master's findings of fact unless they are clearly erroneous. Alaska R.Civ.P. 53(d)(2). The superior court found that the master's findings were not clearly erroneous, and so adopted them. On appeal, we review the master's findings according to the same standard. D.L.J. v. W.D.R., 635 P.2d 834, 836 n. 1 (Alaska 1981).
[10] Former AS 20.15.050 was renumbered AS 25.23.050 in 1982.
[11] This court has developed the following heightened burden of proof for the consent exceptions:

[T]he adoptive parent has the burden of proving by clear and convincing evidence that the natural parent failed significantly to communicate with or to provide support for the child. Because only the natural parent could explain why he or she failed to communicate with or to provide support for the child, fairness requires that he or she then bear the burden of coming forward with evidence of justifiable cause for such omissions before justification becomes an issue. See 9 J. Wigmore, Evidence § 2486 (3d ed. 1940). Thereafter, the burden of proving by clear and convincing evidence that the natural parent's omissions were not justified rests with the adoptive parent. On review, we will subject the findings to the clearly erroneous test generally used for review of questions of fact.
D.L.J. v. W.D.R., 635 P.2d 834, 838 (Alaska 1981) (footnote omitted).