In the Matter of the ADOPTION OF
B.S.L., A Minor Child.

Irma L. ADDISON, Appellant,

v.

Frederick DANIELSON, Pamela Sue
Lord and Charles William Lord, and
any other person having any claim of
custody of Becky Sue Danielson, Appel-
lees.

No. S–2431.

Supreme Court of Alaska.

Sept. 15, 1989.

W. Clark Stump, Stump & Stump, Ketchikan, for appellant.

Anthony M. Lombardo, Keene & Currall, Ketchikan, for appellees, Pamela Sue Lord and Charles William Lord.

## OPINION

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

COMPTON, Justice.

This appeal arises from an adoption proceeding. The trial court found that the natural mother had for three years failed significantly without justifiable cause to communicate meaningfully with the child. Accordingly the court concluded that the mother's consent to adoption was not required. *See* 25.23.050(a).[1] The court entered the decree of adoption, terminating the mother's parental rights. We affirm.

## I. FACTS AND PROCEEDINGS.

In January 1979 Irma Addison, then 16 years old, ran away from her home in California and went to Colorado Springs. There she met Rick Danielson and began an intimate relationship with him. In December 1979 she and Rick moved to California. It was there that their child, Becky Sue, was born in November 1980.

In January 1982 Rick left California and moved to Alaska in hopes of finding employment. He intended to send for Irma and Becky Sue once he found work. Soon after Rick left for Alaska, Irma returned to Colorado Springs. She lived there first with Rick's mother, Rebecca Danielson, and later with Betty and Jim McDowell as their live-in babysitter. On April 2, 1982, Irma received news that her father was terminally ill. She left Becky Sue in the care of Rebecca Danielson and traveled to California to be with her father.

Several days after Irma's departure, Mrs. Danielson and Mrs. McDowell reported to the county department of social services that Irma had neglected and abused Becky Sue. The department obtained legal custody of Becky Sue; Mrs. Danielson was granted physical custody of the child. A few days later, Rick flew to Colorado Springs, picked up Becky Sue, and one hour later returned to Anchorage.

Irma remained in California for two weeks. She returned to Colorado Springs to discover that Rick had taken Becky Sue to Alaska. Soon after Irma's return, Mrs. Danielson told the department of social services that the allegations of abuse and neglect had been false. She also admitted that the false report had been prompted by her fear that she would lose contact with the child.

Several days after Irma's return, she received a telephone call from Rick. He asked her to visit him in Alaska, but told her that he would not allow her to see Becky Sue. Though Mrs. Danielson offered to pay Irma's round-trip air fare, Irma did not travel to Alaska.

Irma remained in Colorado Springs, residing first with Mrs. Danielson and again briefly with the McDowells as a babysitter. During this period, Irma spoke to a legal aid attorney about obtaining custody of Becky Sue; he told her that he could not help her.

In July 1982 Irma married Roger Addison and moved with him to Ohio. In March

---

1. AS 25.23.050(a) provides in part:
   Consent to adoption is not required of

   .  .  .  .  .

   (2) a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause, including but not limited to indigency,

   (A) to communicate meaningfully with the child....

1983 a daughter, Jennifer, was born to the couple.

In the years that followed her marriage to Roger, Irma made few attempts to locate or communicate with Becky Sue. At various times she spoke with social workers and attorneys about obtaining custody of Becky Sue, but nothing ever came of the meetings. Irma remained in contact with Rick's grandmother, whom she knew as "Gram." The two spoke about Becky Sue, and Irma expressed a desire to raise Becky Sue and Jennifer as sisters. Irma asked for and received photographs of Becky Sue. Irma did not ask where Becky Sue was living, nor did she send any cards or presents to Becky Sue. Irma apparently believed that any attempt by her to communicate with or locate Becky Sue would be futile.

From 1982 to 1985, Becky Sue resided in Alaska. At various times she lived with Rick, Mrs. Danielson, Rick's sister, Pamela, and her husband, Charles Lord.

In December 1985 Pamela and Charles Lord filed a petition for adoption of Becky Sue. Rick consented to the adoption. Pamela and Charles asserted that because Irma had failed to communicate with Becky Sue for three years, her consent was not required. Irma was notified of the petition, and, after appointment of counsel, she filed an objection.

The case was tried before Judge Thomas E. Jahnke. Judge Jahnke concluded that Irma's consent was not required and that the adoption was in the best interests of Becky Sue. Accordingly he entered a decree of adoption, terminating Irma's parental rights. Irma appeals.

## II. THE TRIAL COURT DID NOT ERR IN FINDING THAT IRMA'S FAILURE TO COMMUNICATE WITH BECKY SUE WAS WITHOUT JUSTIFIABLE CAUSE.

Consent to an adoption is not required "if the parent for a period of at least one year has failed significantly without justifiable cause, including but not limited to indigency, ... to communicate meaningfully with the child." AS 25.23.050(a).

Irma concedes that for nearly three years she did not communicate with Becky Sue. She contends, however, that the trial court erred in finding that her failure to communicate was without justifiable cause.

In concluding that Irma's failure to communicate was without justifiable cause, the trial court made a finding of fact. We will disturb a trial court's findings of fact only when we are convinced that they are clearly erroneous, that is, when we are left with a definite and firm conviction on the entire record that a mistake has been made. *Martens v. Metzgar*, 591 P.2d 541, 544 (Alaska 1979).

A parent has the duty to make reasonable efforts to locate and communicate with his or her child. *E.J.S. v. State, Dep't of Health & Social Serv.*, 754 P.2d 749, 751 (Alaska 1988). Irma's failure to communicate with Becky Sue was justified only if her efforts to communicate were objectively reasonable in light of the existing circumstances. *See D.L.J. v. W.D.R.*, 635 P.2d 834, 839 (Alaska 1981) ("whether the cause was justifiable must turn on the court's determination of what grounds are objectively acceptable").

The prospective adoptive parents have the burden of proving by clear and convincing evidence that the natural parent's failure to communicate was without justifiable cause. *Id.* at 838. Further, AS 25.23.050(a) should be strictly construed in favor of the natural parent and against a finding that the failure to communicate was without justifiable cause. *Matter of Adoption of K.M.M.*, 611 P.2d 84, 88 (Alaska 1980).

As Irma points out, significant obstacles made communication with Becky Sue difficult. Irma and Roger were indigent throughout the three-year period; they were a great distance from Alaska; they appear to have lacked legal sophistication. More importantly, the Danielson family engaged in a course of conduct intended to deny Irma access to the child. Rick apparently hoped that by denying Irma access to the child he could force her to reconcile

with him. Rick's mother, fearful that she would lose contact with Becky Sue, filed a false report of child abuse to prevent Irma from obtaining custody of the child. Rick's grandmother, though she maintained contact with Irma, never offered to give Irma Becky Sue's address or encouraged Irma to communicate with Becky Sue. Irma's suspicion that efforts to communicate with Becky Sue would be met with hostility was not wholly without foundation.

Irma points out that she made several attempts to obtain custody of Becky Sue. After returning to Colorado Springs in 1982, Irma spoke with a legal aid attorney and with a district attorney. Apparently the attorneys told her that she would have to have physical custody of Becky Sue before initiating proceedings and that Rick's actions were not illegal. Irma also may have spoken to two Colorado Springs attorneys in private practice and received similar responses. In 1983, Irma and Roger filed for bankruptcy; Irma asked the bankruptcy attorney if he could help her to obtain custody of Becky Sue, but he did not take the case. Irma also spoke to an Ohio welfare worker, but was again advised that she should obtain physical custody before initiating proceedings. Later, in California, Irma spoke to child protective services. Again her efforts ended when she was told that she would have to obtain physical custody of Becky Sue.

Irma also contends that Becky Sue's age—she was 16 months old when Rick took her to Alaska—would have made meaningful communication over the phone or by letter unlikely.

Irma's arguments have some force. Irma apparently believed that any attempt to communicate, short of obtaining physical custody of Becky Sue, would be blocked by the Danielson family. Accordingly her efforts were limited to occasional attempts to obtain custody. Her indigency and her lack of legal sophistication may have contributed to the appearance of half-heartedness that characterized these attempts.

■ Nonetheless, we conclude that the trial court did not clearly err in finding that Irma's failure to communicate was without justifiable cause. As the trial court remarked, Irma never tested her assumption that an attempt to communicate with Becky Sue would be blocked. Though she communicated regularly with Rick's grandmother, she never requested Becky Sue's address. Further, as the trial court noted, after the adoption proceedings were initiated, and after Irma was provided with Becky Sue's phone number, "she made only a few attempts to contact Becky Sue by telephone (all or most in a single week) and sent nothing through the mail."[2] Finally, Irma's sporadic and unsustained efforts to obtain custody of Becky Sue do not rise to the level of "reasonable efforts." *See E.J.S.*, 754 P.2d at 751.

As Irma points out, the conduct of Rick and Mrs. Danielson may have been intended to deny Irma access to Becky Sue. However, the issue in this case is not the conduct of Rick and his mother, but the conduct of Irma. Rick and Mrs. Danielson's conduct, however reprehensible, did not relieve Irma of her duty to make reasonable efforts to communicate with Becky Sue.[3] The trial court found that Irma had

**2.** Irma contends that this statement by the trial court is not supported by the record and that Irma's conduct during 1986 is not relevant to the question before the trial court. The trial court's statement is supported by the record. Irma's conduct after notification of the adoption proceeding is relevant to the question whether her earlier failure to communicate was without justifiable cause: her conduct in the *absence* of obstacles to communication might help the court to determine whether her earlier failure was in fact the result of obstacles to communication or merely the result of a lack of will.

**3.** The dissent's reliance on *S.M.K. v. R.G.G.*, 702 P.2d 620 (Alaska 1985), is misplaced. In *S.M.K.,*

as in this case, the father and his family engaged in conduct intended to deny the mother access to the child. *Id.* at 621. There the resemblance ends.

The mere fact that a parent is at some point wrongfully denied access to the child is not dispositive of the issue of justification. The court must consider as well the efforts of the parent to overcome the denial. Though the mother in *S.M.K.* was denied access to her child, she attempted with diligence to obtain her child's return. *Id.* In contrast Irma appeared to be resigned to the loss of Becky Sue. Her efforts to obtain Becky Sue's return were sporadic and unsustained.

failed to make reasonable efforts. This finding is not clearly erroneous.[4]

## III. THE PROVISIONS FOR TERMINATION OF PARENTAL RIGHTS PURSUANT TO AN ADOPTION PROCEEDING ARE NOT UNCONSTITUTIONAL.

▮ Two statutory mechanisms provide for the involuntary termination of parental rights, adoption proceedings and child-in-need-of-aid proceedings. *S.J. v. L.T.*, 727 P.2d 789, 795 (Alaska 1986). In an adoption proceeding, the court may terminate the parental rights of a natural parent if it determines:

> (1) parental consent to adoption is not required; and

> (2) adoption is in the best interests of the child.

AS 25.23.050; AS 25.23.120(c); AS 25.23.130(a). In a child-in-need-of-aid proceeding, the court may terminate the parental rights of a natural parent if it determines:

> (1) there is a child in need of aid under 47.10.010(a)(2) as a result of parental conduct; and

> (2) the parental conduct is likely to continue.

AS 47.10.080(c)(3).

Irma contends that this statutory scheme distinguishes without rational basis two groups of parents:

> (1) parents whose children are the subjects of adoption proceedings; and

> (2) parents whose children are not the subjects of adoption proceedings.

Irma contends that the statutory scheme therefore violates on its face both equal protection and substantive due process of law.

Irma asserts that the shared purpose of the two statutory termination mechanisms is to terminate the rights of unfit parents. That a child is the subject of an adoption proceeding says nothing about the fitness of the child's parent. Therefore, Irma contends, by applying in adoption proceedings a more stringent standard of parental conduct,[5] the legislature has classified parents on the basis of a factor without rational relation to the purpose of the adoption statute.

Viewed broadly, termination of parental rights incident to adoption proceedings and termination incident to child-in-need-of-aid proceedings serve the same compelling purpose: advancing the best interests of children. Viewed more closely, the two mechanisms serve quite different purposes. *Matter of Adoption of R.H.A.*, 702 P.2d 1259, 1265 (Wyo.1985). An adoption proceeding operates to *replace* a parent, while a child-in-need-of-aid proceeding operates to *emancipate* a child from an offending parent's legal bonds. *Davis v. Davis*, 708 P.2d 1102, 1112 (Okla.1985). Through an adoption proceeding a child may be placed in a stable, permanent home; through a child-in-need-of-aid proceeding a child may be placed in an environment which, though

---

It should also be observed that in *S.M.K.*, this court merely affirmed a trial court's finding that the failure to communicate was justified. Thus, even if the facts in the two cases were identical it would not follow that the trial court's finding in this case should be set aside as clearly erroneous. The trial court heard lengthy, in-court testimony from Irma, Rebecca Danielson and others. To all appearances, it rendered a careful and thoughtful decision. The clearly erroneous standard demands that we defer to the trial court in this matter.

4. Irma asserts that, because she filed a complaint for custody of Becky Sue during the pendency of the adoption proceedings, the court should have applied AS 25.20.060(a), which requires the court to award custody on the basis of the best interests of the child. This, she asserts, the court did not do.

AS 25.23.120(c) requires the trial court in an adoption proceeding to determine whether the adoption is in the best interests of the person to be adopted. Where a complaint has been filed as well under AS 25.20.060, and the court determines that adoption is in the child's best interests, this determination effectively serves as a determination that custody in the complaining parent is not in the child's best interest.

The trial court in this case found that adoption by the Lords was in Becky Sue's best interests. Thus, the court properly denied Irma's complaint for custody.

5. Curiously, in her opening brief Irma asserts that the criteria for termination of parental rights under AS 47.10.080 "are much more lax" than those under AS 25.23.050.

uncertain, is preferable to the dangerous environment he or she occupies. *See Watkins v. Dudgeon*, 270 Ark. 516, 606 S.W.2d 78, 81 (1980).[6]

The different purposes of the two statutory mechanisms justify the use of different standards.[7] A parent's conduct, though not so dangerous as to warrant placement of the child with the state, may nonetheless justify disregarding the parents' refusal to consent to adoption. *Cf. Matter of Adoption of R.H.A.*, 702 P.2d at 1265 (rejected similar constitutional challenge on ground that "[t]he two statutes in question do not serve identical purposes, and appellant has not cited authority or suggested any logical reason why the two statutes should have identical standards"). Irma's constitutional argument is therefore without merit.[8]

The judgment of the superior court is AFFIRMED.

RABINOWITZ, J., with whom MATTHEWS, C.J., joins, dissenting.

RABINOWITZ, Justice, with whom MATTHEWS, Chief Justice, joins, dissenting.

Given the particular facts of this case I cannot agree that the Lords proved by clear and convincing evidence that the natural mother's reasons for not communicating with her daughter did not constitute "justifiable cause" under AS 25.23.-050(a)(2)(A). In light of the mother's youth and indigency throughout the period in question, the impact of her indigency on her efforts to regain custody of her minor daughter, and the obstructive conduct of the natural father and several members of his family, I conclude that the Lords failed to prove, by clear and convincing evidence, lack of justification on the part of the natural mother.

In *Delgado v. Fawcett*, 515 P.2d 710 (Alaska 1973), we agreed with the Supreme Court of Minnesota's observation that:

The correlative rights and duties inherent in the parent-child relationship are natural rights of such fundamental importance that it is generally held that parents should not be deprived of them "except for grave and weighty reasons." In an adoption proceeding, where an absolute severance of this relationship is sought, the consent provisions are designed to protect the natural rights of a parent to the custody, society, comfort and services of the child.

*Id.* at 712 (quoting *In re Parks' Petition*, 267 Minn. 468, 127 N.W.2d 548, 553 (Minn. 1964) (footnote omitted)). Alaska's forfeiture of consent statute provides in part that consent to adoption is not required of

---

6. The drafters of the Uniform Adoption Act, upon which AS 25.23.050 is based, remark in a prefatory note,

While many juvenile court acts contain provisions for terminating parental rights, many of these acts by concentrating on the fault of a particular type of parent are inadequate where the objective is termination of the parental right to control adoption.

Unif. Adoption Act 9 U.L.A. 11 (1971).

7. In *Matter of Adoption of K.S.*, 543 P.2d 1191 (Alaska 1975), this court discussed the two mechanisms:

There appears to be no rational basis for the application of a lesser standard of proof in adoption cases since a finding of unfitness would incur the same result: a termination of parental rights.

*Id.* at 1195. Irma relies on this remark in arguing that no basis exists for the use of different standards in each of the mechanisms.

Irma's reliance is misplaced. The purport of the remark is *not* that no basis exists for applying different *standards of parental conduct;* rather that no basis exists for applying different *standards of proof.* The court merely held that the "clear and convincing evidence" standard of proof should be applied in both proceedings. *Id.* Thus, *Matter of K.S.* is inapposite.

8. Irma's argument is merely that the statutory classification is without rational basis, and that the classification therefore violates state and federal equal protection and state and federal substantive due process. Federal equal protection and state and federal substantive due process appear to require only a rational basis. *See Concerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974); *Lehr v. Robertson*, 463 U.S. 248, 268 n. 27, 103 S.Ct. 2985, 2997 n. 27, 77 L.Ed.2d 614, 631 n. 27 (1983). Because Irma has not raised the question, we do not consider the question whether a more stringent analysis of the means adopted by the legislature may be appropriate under state equal protection law. *See Alaska Pacific Assurance Co. v. Brown*, 687 P.2d 264, 269 (Alaska 1984).

a non-custodial parent if that parent for a period of at least one year has "failed significantly without justifiable cause ... to communicate meaningfully with the child." AS 25.23.050(a)(2)(A). In *D.A. v. D.R.L.*, 727 P.2d 768 (Alaska 1986), we observed:

> In past decisions this court has strictly construed these statutory consent provisions, in order to protect the rights of the natural parent. *S.M.K. v. R.G.G.*, 702 P.2d 620, 623 (Alaska 1985); *R.N.T. v. J.R.G.*, 666 P.2d 1036, 1040 (Alaska 1983); *D.L.J. v. W.D.R.*, 635 P.2d 834, 837 (Alaska 1981) *Matter of Adoption of K.M.M.*, 611 P.2d 84, 87–88 (Alaska 1980). We also have read the term "meaningful communication" broadly. *See K.M.M.*, 611 P.2d at 88. *Contra In re: J.J.J.*, 718 P.2d 948 (Alaska 1986). Thus, in circumstances where the child is too young to read or communicate over the telephone, we have relaxed the requirement of meaningful communication under the "without justifiable cause" language of AS 25.23.050(a)(2)(A). *S.M.K.*, 702 P.2d at 624.

*Id.* at 770.

Irma Addison, at 18 years of age, gave birth to Becky Sue in November of 1980. In April of 1982 Irma received information that her father was terminally ill. Before departing for California Irma made arrangements to leave Becky Sue with Pamela Danielson (now Pamela Lord), the sister of Becky Sue's natural father. On the day of Irma's father's burial she received a call from Rick advising her that he had Becky Sue with him in Alaska.

Upon Irma's return to Colorado she was informed that the local social services department had intervened and filed charges that she had abandoned and mistreated Becky Sue.[1] Irma contacted the district attorney's office as well as legal aid, and was advised that they could not assist her in obtaining the return of Becky Sue from Alaska to Colorado. A hearing on the abandonment charges was subsequently held in May of 1982. At this hearing the charges were dropped, and the case against Irma was dismissed.

Also of significance is the fact that after her return to Colorado from her father's funeral, Irma had a telephone conversation with Rick, who was in Alaska. According to Irma she was told by Rick that he would never allow her to see Becky Sue again, and that if she attempted to come to Anchorage for that purpose she would not get "past the airport."

In July of 1982 Irma married Roger Addison and subsequently gave birth to a daughter. Thereafter, and throughout the entire three-year period in question, Roger and Irma experienced extreme financial difficulties. As the majority notes, during this three-year period Irma made attempts to obtain custody of Becky Sue. In this regard Irma consulted an attorney and welfare officials in Ohio, as well as legal aid and social services representatives in California, all of whom advised her that they could not assist in securing legal custody of Becky Sue until the child could be located.[2]

My analysis of the record and the parties' arguments leads me to the conclusion that the superior court erred in holding that the Lords had proven by clear and convincing evidence Irma's lack of justification for her failure to communicate with Becky Sue. Here I think it evident that a youthful and immature Irma believed that any attempts on her part at communication, short of obtaining physical custody of Becky Sue, would be hindered by the Danielson family. Further, it is apparent that Irma's indigency[3] and her lack of legal

---

1. These charges were based in part on "false" allegations of Rebecca Danielson, the mother of Rick Danielson.

2. In April of 1982, Rick had custody of Becky Sue in Anchorage; in November of 1982 Becky Sue was in the custody of Rebecca Danielson in Ketchikan and Thorne Bay; in February of 1985 Becky Sue was back in Anchorage with Rick; in May of 1985 Rebecca Danielson again had custody of Becky Sue in Ketchikan; and in December of 1985 Pamela Danielson had custody of Becky Sue in Texas.

3. Alaska Statute 25.23.050(a)(2) specifically mentions indigency as a justification. I think it apparent that any lack of sophistication on Irma's part in locating or communicating with

sophistication hampered her efforts throughout this three-year period to communicate with and obtain custody of Becky Sue.[4] Given this record and the rules of construction we alluded to in *D.A. v. D.R.L.*, 727 P.2d at 770, I conclude that the superior court erred in holding that the requirement of Irma's consent to the adoption of Becky Sue had been forfeited.

A.H., Appellant,

v.

Becky Sue could have been overcome had Irma hired a competent lawyer and been able to afford to travel to Alaska. In particular, with the assistance of a competent lawyer Becky Sue could have been located, and early custody proceedings could have been commenced, particularly at times during which Becky Sue was in the physical custody of persons other than her father.

4. The instant facts resemble those in *S.M.K. v. R.G.G.*, 702 P.2d 620 (Alaska 1985). In that case the father took his son from Alabama to Alaska. *Id.* at 621. When the mother eventually located her son two years later, she did not attempt to communicate with him because (a) she did not believe her letters would reach him and (b) she believed the son was too young to understand what was going on. *Id.* at 622. Nor did she personally visit her son, because she lacked the financial ability to travel to Alaska. *Id.* at 624.

We found the mother's beliefs reasonable. *Id.* at 625. Further, we expressly rejected the notion that one can remove a child from an indigent mother and then call the mother's failure to visit unjustified:

[W]e are astonished that the Kayes could plea to this court the "unjustified" actions of Stuart's mother, when it was the Kayes and other members of [the father's] family who collaborated to wrongfully deny Stuart access to his mother during Stuart's first few years of life. To hold that Ruth's failure to communicate was not justifiable in these circumstances would only serve to encourage the obstruction of court-ordered custody rights, and trap the indigent parent.

*Id.* at 625.