NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| BECKY H., ) | |
| ) | Supreme Court No. S-15643 |
| Appellant, ) | |
| ) | Superior Court No. 3AN-12-02300 PR |
| v. ) | |
| ) | MEMORANDUM OPINION |
| MARTIN G. and DONNA G., ) | AND JUDGMENT[*] |
| ) | |
| Appellees. ) | No. 1547 – July15, 2015 |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Sen K. Tan and William F. Morse, Judges.

Appearances: Kenneth Kirk, Anchorage, for Appellant. Rhonda F. Butterfield, Wyatt & Butterfield, LLC, Anchorage, for Appellees.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

## I.      INTRODUCTION

The superior court granted an adoption over the child's mother's objection, finding that the mother's consent was not required because without justifiable cause she had failed to communicate meaningfully with the child for 15 months. The mother appeals, arguing that as a matter of either law or fact the decision is flawed because

---

[*]      Entered under Alaska Appellate Rule 214.

during that 15 month period, in connection with a separate petition for a domestic violence protective order, the mother was under court-ordered restrictions limiting her ability to communicate with the child. On the totality of the virtually undisputed facts of this unusual case, we cannot conclude that the superior court erred as a matter of law or fact; we therefore affirm the superior court's grant of the adoption.

## II.    FACTS AND PROCEEDINGS

Becky[1] is the mother of Allison, born in September 2007. As a result of a prior custody case, Allison's paternal grandparents, Martin and Donna, have had legal and primary physical custody of Allison since August 2008. Becky had visitation rights under the custody order.

### A.    Domestic Violence Protective Order Proceedings

In mid-August 2011 Donna petitioned on Allison's behalf for a 20-day ex parte and a subsequent long-term domestic violence protective order against Becky. The petition was grounded on assertions that after an unsupervised visit with Becky, Allison "was itching herself in her rectal area" and reported that Becky had penetrated, digitally or with another object, Allison's vaginal and rectal openings. The petition also included information that the Office of Children's Services (OCS) had expressed "concern[] with [Becky] having any unsupervised contact with [Allison] until she has obtained a sex offender assessment that shows she is not at risk of reoffending against [Allison]."

The superior court granted the ex parte protective order. At a September 9 hearing for a long-term order, Becky's attorney asked for a continuance because he had been retained only the day before and needed time to obtain and review relevant information. The court granted a one-month continuance, leaving the ex parte order in place. The court also ordered OCS to submit a status report about its investigation.

---

[1]    We use pseudonyms for the family members involved in this appeal.

At an October 7 hearing Becky represented that she was "prepared to go forward." The court suggested that Becky consider OCS's potential involvement even were she to prevail at the hearing and go back to the existing visitation order from the 2008 custody case, noting the possibility that OCS could step in to limit Becky's visitation with Allison until its sex offender concerns were alleviated. After conferring with her attorney Becky asked for another month's continuance to allow her time to obtain a sex offender assessment. Donna agreed to the continuance and to interim visitation, supervised by Allison's therapist, as long as Becky paid for half of the supervision expense. The superior court so ordered.

At a November 21 hearing the court learned that Becky had attended only one supervised visit, and that Donna and Martin had paid the supervision expense for that visit. Becky claimed she failed to schedule more visits because she lost the therapist's telephone number; the court did not find this explanation credible. Becky stated that she had made no progress on a sex offender assessment, but noted that she had just married and would be covered by her husband's insurance in December. Becky requested another continuance and "urge[d] the Court to order some supervised visitation."

The superior court responded by giving Becky the choice between two options: proceeding immediately to trial on the domestic violence petition, or continuing that trial without any interim visitation. Becky chose the continuance with no interim visitation, and another hearing was set for January 2012.

At the January hearing Becky advised that she had not yet obtained a sex offender assessment, but that an appointment was set for the next week to start the process. When asked what she wanted to do, Becky requested another continuance without mentioning interim visitation and acknowledged that no visitation would occur. A hearing was set for March and the existing protective order remained in place.

At the March hearing Becky stated that the sex offender assessor needed collateral information and that it would take another two weeks to get the information to the assessor. An OCS representative stated that Becky had yet to sign release forms for OCS to speak with the assessor and it was unlikely an assessment would be completed soon. The court wanted "to be realistic so that the next time we come back we can either decide to go ahead and have a [domestic violence] hearing or set . . . a hearing." Without any objection or visitation request from Becky, the court set another hearing for late April and left the existing protective order in place.

At the April hearing Becky represented she had completed her sex offender evaluation interviews. The OCS representative stated that Becky had just days before finally signed release forms allowing OCS to provide information to the assessor and that it would provide that information in the near future, but noted that the evaluation clearly had not been completed. Recognizing that the goal had been to get the sex offender assessment completed, the court ordered that the matter would be continued for another 30 days, and that Becky should ask the assessor for a good estimate of the report's completion date. Becky did not object or request visitation in response, and the existing protective order remained in place.

Neither Becky nor her attorney appeared for the May hearing. The OCS representative stated that OCS had forwarded its information to Becky's assessor. The court stated "I've now continued [this domestic violence matter] far longer than I feel comfortable. . . . [But] because of the stipulation of the parties, I've been willing to do it to collect . . . the best information available . . . and everybody seems on board with it." The court then set another hearing for early July. The OCS representative asked if OCS should continue to participate in the proceeding, and the court replied that it would be sufficient if OCS provided information to the assessor. The OCS representative stated

OCS's position that if the sex offender assessment revealed "medium or high risk," the court should limit Becky to supervised contact with Allison.

At the July hearing Becky claimed she was waiting for the assessor to call her for a final meeting before the assessment could be completed. The parties agreed to continue the proceeding until September to allow time for the report to be completed. Without objection or a visitation request from Becky, the court left the existing protective order in place.

At the September hearing Becky's assessment still was not available, and Becky asserted that the assessor was not returning her telephone calls. Becky claimed she had last seen the assessor the previous October and that she was current with her payments to the assessor. The court directed the parties to agree on a final hearing date and suggested to Becky's attorney that he communicate with the assessor about the hearing and the need for the report and/or testimony. There was no discussion whether the existing protective order should be modified.

At a November hearing Becky's attorney advised the court that contrary to Becky's September statements, Becky was not current with her payments to the assessor and that in addition to payment, Becky still needed to meet with the assessor again. After being advised that Donna and Martin had filed a separate adoption petition,[2] the court set a January 2013 trial date for the domestic violence petition to proceed regardless of the sex offender assessment's status. Becky's attorney noted that the court had been "very patient" and that he understood the final hearing would go forward in January. No interim visitation request was made.

Becky was unable to attend the January 2013 trial because of medical issues, but she expressly waived her right to be present during the trial. At the

---

[2]    We describe the adoption proceeding below.

conclusion of the trial the superior court found insufficient evidence that Becky had sexually abused Allison, but found sufficient evidence that Becky had committed some kind of assault rising to the level of domestic violence. The court entered a long-term protective order reinstating supervised visitation between Becky and Allison.

Summarizing Becky's visitation with Allison relative to the domestic violence matter: Prior to mid-August 2011, under the existing child custody order, Becky had unsupervised visitation; from mid-August to early October 2011, under the ex parte domestic violence protective order, she had no visitation rights; from early October 2011 to mid-November 2011, during the second continuance Becky requested, Becky had the right to supervised visits, but exercised that right only one time; beginning mid-November 2011 through January 2013, during the numerous continuances Becky requested after being given the choice to either (1) go to immediate trial on the domestic violence petition or (2) continue the trial but forgo any visitation until the trial was completed, Becky had no visitation rights. After choosing to forgo visitation pending trial, Becky never requested that supervised visitation be re-instituted; supervised visitation was re-instituted in January 2013 at the domestic violence trial's completion.

**B.      Adoption Proceedings**

Martin and Donna filed their adoption petition in October 2012. They asserted that Allison had been in their care since August 2008 and that Becky's consent to the adoption was unnecessary under AS 25.23.050(a)(1) and (2).[3] They alleged that

---

[3]      The statute provides:

(a) Consent to adoption is not required of

(1) for purposes of this section, a parent who has abandoned a child for a period of at least six months;

(2) a parent of a child in the custody of another, if the

(continued...)

Becky had abandoned Allison for more than six months, had failed significantly and without justifiable cause to provide for Allison's care and support, and had failed significantly and without justifiable cause to communicate with Allison for over one year. Allison's father consented to the adoption. Becky did not.[4]

The adoption petition was assigned to the same superior court judge who had been assigned to both the 2010 adoption petition and the 2011 domestic violence protective order petition. The court held trial in April 2014. After trial the court concluded that Martin and Donna had proved by clear and convincing evidence that Becky's failure to communicate with Allison during the 15 months of the domestic violence proceedings was unjustified. The court therefore granted the adoption petition.

## III. STANDARD OF REVIEW

We review a superior court's factual findings for clear error when determining whether consent to adoption is required[5] and will conclude that a factual

---

[3]     (...continued)
parent for a period of at least one year has failed significantly without justifiable cause, including but not limited to indigency,

(A) to communicate meaningfully with the child, or

(B) to provide for the care and support of the child as required by law or judicial decree.

[4]     We note this was Martin and Donna's second adoption petition for Allison. They had filed a similar petition in 2010, before the August 2011 domestic violence proceedings; it was denied for lack of consent by Becky, and Martin and Donna dismissed their appeal of that denial during the later domestic violence proceedings.

[5]     *See In re Adoption of B.S.L.*, 779 P.2d 1222, 1224 (Alaska 1989); *see also In re J.J.J.*, 718 P.2d 948, 957 (Alaska 1986) ("The superior court's findings in an adoption case are subject to the 'clearly erroneous' standard generally used for review
(continued...)

finding is clearly erroneous "when we are left with a definite and firm conviction on the entire record that a mistake has been made."[6]

## IV. DISCUSSION

Becky argues that as a matter of law, or at least that as a factual matter given the circumstances of this case, the existence of the domestic violence protective order restricting her visitation with Allison must lead to the conclusion that her failure to communicate with Allison was not willful and was justified. We reject the argument that the mere existence of an order restricting visitation must, as a matter of law, lead to the conclusion that resulting failure to communicate is not willful and is justified. Facts matter. And the following excerpt from the superior court's decision, after the court painstakingly detailed the long, drawn-out domestic violence proceedings and the numerous continuances granted for Becky's benefit, demonstrates why:

> Looking at AS 25.23.050(a)(2)(A), failure to communicate meaningfully with the child, there was a period when the DV order was in effect that [Becky] had no contact with [Allison] for a period of 15 months. [Martin and Donna] have met their initial burden of proof. The issue then is whether there is justifiable cause, and whether the element of willfulness has been satisfied. Failure to meaningfully communicate can be justified if it is caused by circumstances out of the parent's control.
>
> It is difficult to assess why [Becky] had no contact with [Allison], as there were a multitude of factors affecting [Becky's] contact with her. There was certainly the issue of the OCS finding that substantiated child abuse. Given this finding, OCS would not have countenanced unsupervised visits. This required [Becky] to take certain steps to try to

---

[5]    (...continued)
of questions of fact.").

[6]    *In re Adoption of B.S.L.*, 779 P.2d at 1224.

rectify the situation. . . . Yet within this time frame, [Becky] got married, and the [s]ex [o]ffender [a]ssessment was supposed to be paid for by her husband's insurance. In the end the marriage lasted only about a year and it is not clear whether a report was ever prepared and finalized.

[Becky] was initially given supervised visitation, but she did not take advantage of it. Her excuse that she "lost" [the therapist's] phone number rings hollow. It would appear that [Becky] was more focused on her own life from October to November 2011 when she had the opportunity for supervised visitation, but only one visit occurred and that was paid for by [Martin and Donna]. Based on this track record, visitation was suspended and the case was continued time and time again at [Becky's] request, based on representations that [the sex offender assessment] report would be forthcoming.

During this entire period in which visitation was suspended, [Becky] did not at any time come forward to reinstitute visitation or propose any other means by which she could continue contact with [Allison]. Towards the latter part of 2012, [Becky's] marriage was falling apart and she was diagnosed with HIV, bringing on or exacerbating [Becky's] mental health issues.

In general, this court is left with the impression that [Becky] was facing many issues of her own and did not have the wherewithal either emotionally or financially to care for [Allison]. Because of the dire straits she was in, [Becky] made a conscious choice not to try to have contact and visitation with [Allison]. (Footnote omitted.)

On the virtually undisputed underlying factual findings and the superior court's credibility assessment, we cannot say it was clearly erroneous to find Becky's failure to communicate meaningfully with Allison was a conscious choice and therefore

willful and unjustified.[7] Becky undeniably faced difficult challenges and decisions, but her actions and her choices continually placed Allison last in her life. Becky committed some kind of assault on Allison, a willful action that led immediately to visitation restrictions. Then given the choice to (1) resolve that matter expeditiously and obtain what everyone, including OCS, seemed to appreciate was at worst a supervised visitation restriction, or (2) forgo interim visitation pending a delayed trial, Becky chose the option that came without visitation with Allison. And during the next 15 months of continuances for her benefit, she never once asked the court to reinstate supervised visitation.[8]

Becky consciously chose her course of action. As the superior court noted, her "choice to continue the DV hearing may have been motivated by a desire to salvage a bond [with Allison] rather than to destroy it[, but] [e]ven so, this resulted in an extended period of time where there was no contact between [Becky] and [Allison]." And, as the superior court also noted (without dispute by Becky in this appeal), this "had its impact on their relationship."

Choices matter. Contrary to her argument on appeal, Becky was not browbeaten or forced by the superior court into the course of action she ultimately chose. And having made her choice and put visitation with Allison at the very bottom of her priorities, she cannot now avoid the consequences of her choice by arguing she was involuntarily precluded from communicating with Allison.

---

[7]    Becky does not appeal any of the superior court's underlying factual findings.

[8]    Although Becky suggests on appeal that she was indigent during the domestic violence proceeding and that it was her indigency that delayed the sex offender assessment, she did not make this argument to the superior court to support a request for interim visitation during the 15 months of delay.

## V.    CONCLUSION

We AFFIRM the superior court's decision granting Allison's adoption by Martin and Donna.