**BRUCE L., Appellant,**

v.

**W.E., H.E., & Connie J., Appellees.**

**No. S–13580.**

Supreme Court of Alaska.

Feb. 11, 2011.

---

Ann DeArmond, Sterling & DeArmond, P.C., Wasilla, for Appellant.

Eric Conard, Law Office of Eric Conard LLC, Palmer, for Appellees W.E. and H.E.

No appearance by Appellee Connie J.

Before: FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

## OPINION

WINFREE, Justice.

## I. INTRODUCTION

A biological father appeals from the termination of his parental rights and an adoption decree, arguing it was error for the trial court to (1) fail to apply certain protections available to him under the Indian Child Welfare Act (ICWA) and (2) find his consent to the adoption unnecessary under state law. We vacate the trial court's determination that the child is not an Indian child under ICWA because it is not explained in the court's written decision why, after the parties to the proceeding took the position that the child is an Indian child and that this was an ICWA adoption, the trial court sua sponte found and relied on a proof deficiency without giving the father notice and opportunity to address it. We also reverse the trial court's determinations that (1) the father's efforts to obtain custody through the courts were not justifiable cause for his failure to meaningfully communicate with the child during the first year of the child's life, and (2) the evidence in the record of the father's indigence did not meet his burden of production regarding justifiable cause for his failure to support the child during that year. We therefore vacate the termination of the father's parental rights and the adoption decree and remand for further proceedings on the child's status as an Indian child, possible ICWA protections available to the father, and whether the father unjustifiably failed to support the child during the first year of the child's life.

1. Pseudonyms are used for all persons involved.

## II. FACTS AND PROCEEDINGS

### A. Timothy's First Year of Life[1]

#### 1. Pre-litigation

Roughly one month before his son Timothy's birth, Bruce L. met with a married couple (the Eberts) interested in adopting Timothy. Bruce informed the Eberts he would not consent to the adoption. Bruce anticipated being away on a commercial fishing job on Timothy's expected birth date and gave the Eberts temporary permission to take care of Timothy.

When Connie J. gave birth to Timothy on July 19, 2007, the Eberts were present. Connie did not include the father's information on the birth certificate. Connie signed a document prepared by the Eberts' attorney that gave the Eberts permission to take care of Timothy in contemplation of adoption. Connie's signature attested:

> I am an Alaska Native, having come from the Alaska Native Village of Unalakleet. As a result of my Unalakleet lineage I believe that my child is an Indian Child under federal law because I believe that my child would be entitled to membership within the Alaska Native Village of Unalakleet.

The document also stated Connie understood she had to appear in court to have her rights explained to her before she could consent to an adoption or permit termination of her parental rights "[b]ecause [her] child is an Indian Child." The Eberts took Timothy home from the hospital.

Bruce returned from his fishing job in July and called Connie at work early in August, leaving a message. Bruce testified that when Connie returned his call on August 9 he asked for visitation with Timothy and offered to pay support, but she told him to contact the Eberts or their attorney. Bruce also testified that he telephoned the Eberts' attorney three or four times in August to request visitation with Timothy, but although the attorney said he would confer with the Eberts, Bruce never heard back from anyone about the possibility of visitation. Mr. Ebert testified he recalled his attorney receiving

one phone call from Bruce, when the attorney gave Bruce the case number for the adoption proceeding filed in August. Bruce also testified that he called the Eberts at their home in late August or September 2007, a female voice answered and put him on hold when he asked to speak with Mr. Ebert, and the call was disconnected without anyone speaking to him. Mr. Ebert disputed that anyone in his household received this call from Bruce.

### 2. Initial adoption petition at one month

The Eberts filed a verified petition to adopt Timothy on August 21, 2007. In this petition they stated, under oath:

> [Timothy] is an "Indian Child" as that term is defined by 25 USC § 1901 *et seq.* based [on] [Timothy] being eligible for membership in an Alaska Native Village as defined in 43 USC § 1610(b)(1). Pursuant to 25 USC § 1903(5) it appears that [Timothy]'s Indian Tribe is Native Village of Unalakleet.

The Eberts also stated they and Connie would observe ICWA's requirements for Connie's consent to adoption and voluntary relinquishment of parental rights "[b]ecause [Timothy] is an Indian Child."[2] The Eberts asserted Bruce's consent to the adoption was unnecessary because Bruce had not legitimated Timothy under Alaska law.[3]

Bruce filed an acknowledgment of paternity and affidavit of paternity in the adoption case on September 25, 2007, but those documents failed to legitimate Timothy under state law because Connie did not sign them.[4] On the same day, Bruce moved for custody and asked to be a party to the case. In October the Eberts served notice on Bruce and the Native Village of Unalakleet (Tribe) that there would be a November 14 hearing on the adoption petition.

Bruce appeared at the November 14 hearing. The Eberts' attorney acknowledged on the record that Bruce was contesting the adoption and that Timothy is an Indian child under ICWA. The master questioned Bruce about his income and child support obligations for his other children.[5] The master appointed an attorney for Bruce based on the ICWA provision providing that an indigent parent of an Indian child has a right to court-appointed counsel in termination proceedings.[6] The superior court denied Bruce's motion for custody without prejudice on November 19 but allowed Bruce to be a party to the case.

On December 6 Bruce moved for an order to compel the Eberts to make Timothy available for paternity testing. Eight days later the Eberts requested dismissal of the adoption petition and termination of court-appointed counsel for Bruce. Bruce filed a conditional non-opposition, asking that the Eberts give him physical custody of Timothy

---

**2.** *See* 25 U.S.C. § 1913(a), (c) (providing (1) a parent cannot voluntarily consent to termination of parental rights to an Indian child within ten days after birth; (2) such consent must be "executed in writing," "recorded before a judge," and "accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail" in a language the parent understands and the parent fully understood; and (3) such consent "may be withdrawn for any reason" prior to the final decree of termination or adoption).

**3.** *See* AS 25.23.050(a)(3) (incorporating AS 25.23.040(a)(2)) (providing consent to adoption is not required of a minor's father if the father was not married to the mother at or after the time of conception or the father has not adopted or "otherwise legitimated the minor under" Alaska law). The Eberts' petition did not address whether ICWA applied to Bruce's parental rights, but ICWA excludes from the definition of "parent" "the unwed father where paternity has

not been acknowledged or established." 25 U.S.C. § 1903(9); *accord A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261–62 (Alaska 1999).

**4.** AS 25.20.050(a)(3) allows unwed parents to legitimate a child by jointly signing a form acknowledging paternity. For acknowledgments made before July 1, 1997, the statute requires only the putative parent's signature for legitimation. AS 25.20.050(a)(2).

**5.** Bruce has child support obligations on behalf of Kristin, born to Natalie C. in 2004, and Lulu, born to Teresa S. in 2007.

**6.** *See* 25 U.S.C. § 1912(b); *V.D. v. State, Dep't of Health & Soc. Servs.*, 991 P.2d 214, 218 (Alaska 1999) (citing 25 U.S.C. § 1912(b)) (recognizing ICWA requires court-appointed counsel in removal proceedings when court determines parent of Indian child is indigent).

and reiterating his request that the court order paternity testing. In their reply the Eberts argued the court could not grant Bruce custody because it lacked personal jurisdiction over Connie, and again referred to the adoption as an "ICWA adoption." Bruce left a voice message with the Eberts in December asking them to bring Timothy to a December 28 status hearing so Bruce could take custody of him.

At the hearing the master recommended granting the Eberts' request to withdraw their adoption petition. Bruce's appointed counsel asked that Bruce's requested paternity test go forward, but the master concluded Bruce's motion for paternity testing was moot. The master mentioned that Bruce could "follow[ ]up" on his parental rights by filing a custody case. Ultimately adopting the master's recommendation months later, on June 4, 2008, the superior court dismissed the adoption petition, vacated all orders, and terminated the appointment of counsel for Bruce.

### 3. Bruce's custody action at five months

Three days after the December 2007 status hearing Bruce, acting pro se, filed the custody portion of this consolidated case. In his child support guidelines affidavit Bruce reported $11,750 in gross annual income, $9,000 in wages, $1,100 in unemployment compensation, and $1,650 for his Alaska Permanent Fund Dividend.

Bruce requested an exemption from payment of court fees on the basis of indigence, asserting he was unemployed and had only $10,750 in income for the prior 12 months. He calculated $2,100 in monthly expenses for food, rent, utilities, and other child support obligations, and noted he was behind in his support payments. He also reported he had no assets and debts of $180,000, including a $10,000 garnishment by the Municipality of Anchorage and a mortgage of $170,000.

On January 10, 2008, the court system attempted to mail Bruce a memo stating his fees exemption had been granted and re-minding him to serve process on Connie and to file tax returns and paycheck stubs with the court to verify his income, but the memo was sent to the wrong address and it was re-sent on February 4. On March 4 Bruce filed three W–2 forms and a paycheck stub and asserted that he had earned $5,101.70 in wages in 2007, less than half as much as he reported earlier in his child support guide-lines affidavit. Bruce served Connie by process server on April 14.

On May 5 Connie filed an answer to Bruce's custody suit, asserting there was a "slim chance" that Bruce was not Timothy's biological father. Bruce did not request a hearing date until July 16.

Bruce testified he called the Eberts in May 2008 to request visitation but was refused. Mr. Ebert testified the telephone call oc-curred in July and Bruce did not ask for visitation but instead told Mr. Ebert the court would take Timothy away from him.

On July 19, 2008, Timothy turned one year old. At no time during Timothy's first year did Bruce send Connie or the Eberts any money for Timothy or meet or communicate with Timothy.

### B. After Timothy's First Year—Second Adoption Petition

The Eberts filed a second petition for adoption on July 21, 2008, which is the adop-tion portion of this consolidated case. This verified petition reiterated the first petition's statements regarding ICWA—the Eberts again stated under oath that "[Timothy] is an 'Indian Child' " because of his eligibility for membership in the Tribe and that Connie would appear before the court to consent to the adoption "[b]ecause [Timothy] is an Indi-an Child." In addition to contending that under ICWA Bruce's consent was not re-quired for the adoption because he had not legitimated Timothy, the Eberts asserted that his consent was unnecessary for two new and independent reasons: that Bruce had no meaningful communication with Timo-thy for a period of one year without justifi-able cause,[7] and had provided no support for Timothy.[8]

---

**7.** *See* AS 25.23.050(a)(2)(A) (providing that "[c]onsent to adoption is not required of … a

parent of a child in the custody of another, if the parent for a period of at least one year has failed

On July 29 the Eberts moved to intervene in Bruce's custody case. On August 21 the trial court allowed the Eberts to intervene and sua sponte ordered paternity testing. On October 10 Bruce filed test results proving his paternity of Timothy to a probability of 99.99%.

On October 20 the Eberts moved to consolidate Bruce's custody case with their adoption case. At an interim custody hearing on November 4 the trial court consolidated the two cases and appointed counsel for Bruce under ICWA based on his indigency.[9]

On December 3 Bruce moved for interim custody of or visitation with Timothy. On December 17 Bruce paid $50 to the Eberts' attorney for Timothy's support. After a December 18 and 19 custody hearing and over the Eberts' opposition, the trial court granted Bruce supervised visitation and arranged for a court system grant of up to $500 for visitation services. The trial court also appointed a custody investigator and ordered Bruce to pay $50 per month in child support retroactive to August 2007.

In March 2009 the Eberts served the Tribe notice of the upcoming adoption petition and custody trial. In the notice, the Eberts stated "[i]t appears that under applicable law the child ... is an Indian Child under ICWA."

Bruce's visits with Timothy stopped after ten visits because Bruce did not have any money beyond the initial grant to pay for visitation services. Bruce mailed a $150 child support check to the Eberts shortly before trial, and by the completion of trial Bruce had arranged for another visitation services grant.

## C. Trial—May 2009

The Eberts stated in their pretrial memorandum that they had "concede[d] in their adoption petition that [Timothy] is an Indian Child as a result of [Connie's] affiliation with the [Tribe]." The Eberts also noted they had served a hearing notice on the Tribe's ICWA coordinator. The Eberts nonetheless asserted that (1) Bruce had not been entitled to ICWA protections until he established his paternity in October 2008, and (2) because from that time forward a heightened evidentiary standard applied for the potential termination of Bruce's parental rights, they would prove his parental unfitness beyond a reasonable doubt.[10]

Trial was held May 1, 13, and 18, 2009. On May 1 the Eberts filed proposed findings of fact stating "ICWA plays into this case as a result of [Connie's] membership in the [Tribe]." Connie testified that she is a member of the Tribe. The Eberts introduced a certificate from the United States Department of the Interior Bureau of Indian Affairs (BIA) stating that Timothy's bloodline is 25/64 Eskimo. Bruce did not present any additional evidence on Timothy's status as an Indian child under ICWA.

Bruce testified that after Timothy's birth he had gone to the hospital to try to get his name added to the birth certificate and that he sought paternity testing there and at the Bureau of Vital Statistics without success. He testified that his appointed counsel from the initial adoption case pointed him to the Child Support Enforcement Division (CSED), that he filed paperwork with CSED in March 2008, but that he learned two months later CSED could not proceed without a custodian's consent or a court order. Bruce testified that he had previously had another child's parentage tested, but the process was different because the birth certifi-

significantly without justifiable cause ... to communicate meaningfully with the child").

**8.** *See* AS 25.23.050(a)(2)(B) (providing that "[c]onsent to adoption is not required of ... a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause ... to provide for the care and support of the child as required by law or judicial decree").

**9.** *See* note 6, above.

**10.** *See* 25 U.S.C. § 1912(f) (providing parental rights to Indian child may not be terminated "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child").

cate listed him as the father and the child was in his physical custody.

Bruce's mother testified that he asked her for money to consult a lawyer but that she had not been able to help him. She testified Bruce asked at least three times: first shortly after Timothy's birth, again when Timothy was approximately six months old, and at least one more time before Timothy was a year-and-a-half old. Bruce testified that he could not have gone to anyone else for a loan. Bruce testified that he had $600 monthly child support obligations for other children and that he was about $4,000 in arrears. Bruce also testified he was evicted from his residence in October 2007 for nonpayment of rent.

On May 15, 2009, Bruce filed a memorandum on ICWA's remedial services clause [11] in which he stated: "There appears to be no dispute that [Timothy] is an Indian child.... The pending adoption petition alleges that [Timothy] is an Indian child. The adoption petitioners have submitted evidence that [Timothy] is an Indian child." The Eberts filed a closing brief on May 26 in which they stated that "ICWA had applicability to [Connie] and [the Tribe] from the time of [Timothy]'s birth," but that ICWA did not apply to Bruce until he established his paternity on October 10, 2008, by which time his right to withhold consent had lapsed for failure to support and communicate with Timothy.

The trial court concluded in its June 5, 2009 written decision that (1) "[Timothy] is not an 'Indian Child' within the meaning of [ICWA]," (2) Bruce's consent to the adoption was unnecessary because he "ha[d] not produced 'justifiable cause' for [his] failure to communicate with or support" Timothy for more than one year, and (3) there was "clear and convincing evidence that [Bruce was] unfit to parent [Timothy]" and denying the adoption would be "detrimental and contrary" to Timothy's welfare. The trial court's written decision did not expressly terminate Bruce's parental rights, but in later supplemental findings the court stated that "[p]ursuant to [the June 5, 2009] findings of fact and conclusions of law" Bruce's parental rights "were terminated."

The trial court later accepted Connie's adoption consent [12] and decreed Timothy's adoption by the Eberts.

Bruce appeals.

## III. STANDARD OF REVIEW

▮ Whether an unwed father is a parent entitled to ICWA's protections is a question of law we review de novo.[13] "Whether [a party] made binding admissions is a question of law that we review de novo, applying our independent judgment to adopt the rule of law most persuasive in light of precedent, reason, and policy."[14] We review for abuse of discretion the trial court's decision not to give the parties advance notice that it considered Timothy's status as an Indian child at issue and an opportunity to present additional relevant evidence.[15] A finding that a parent's failure to communicate or support a child was without justifiable cause is a finding of fact that we review for clear error.[16]

11. *Id.* § 1912(d) (providing that parental rights to Indian child cannot be terminated unless "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful").

12. Connie gave consent on the condition that if the adoption decree is vacated, her relinquishment of her parental rights will also be undone.

13. *See L.G. v. State, Dep't of Health & Soc. Servs.,* 14 P.3d 946, 950 (Alaska 2000) ("[A] determination of whether the trial court's findings comport with the requirements of ICWA involves a question of law and will be reviewed de novo." (citing *E.M. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 959 P.2d 766, 768 (Alaska 1998))); *A.A.,* 982 P.2d at 259, 261–62

(reviewing de novo when unwed father first qualified as ICWA parent entitled to ICWA protections).

14. *Pugliese v. Perdue,* 988 P.2d 577, 580 (Alaska 1999) (citing *Langdon v. Champion,* 745 P.2d 1371, 1372 n. 2 (Alaska 1987)).

15. *See Frost v. Spencer,* 218 P.3d 678, 682 (Alaska 2009) (concluding that whether trial court applied unfair procedures is reviewed for abuse of discretion).

16. *See In re J.M.F.,* 881 P.2d 1116, 1118–19 (Alaska 1994) (reviewing for clear error court's finding of fact that mother's failure to support was justifiable); *In re B.S.L.,* 779 P.2d 1222, 1224 (Alaska 1989) (reviewing for clear error

## IV. DISCUSSION

### A. ICWA Issues

**1. It was an abuse of discretion to conclude Timothy is not an Indian child without giving the parties notice that the trial court considered the issue in dispute.**

 ICWA applies to any proceeding that might result in the termination of a parent-child relationship involving an Indian child.[17] "ICWA applies to termination proceedings [even] when a party other than the state seeks the termination" of parental rights,[18] and adoption without consent terminates parental rights.[19]

The trial court concluded that there was "no credible evidence that [Timothy] qualifies as an 'Indian child'" under ICWA. But until the trial court issued its decision, whether Timothy is an Indian child was never in dispute. The Eberts' first and second verified adoption petitions stated that Timothy "is an 'Indian Child'" based on his eligibility for membership in the Tribe. The Eberts' attorney acknowledged during the November 14, 2007 hearing on the initial adoption petition that Timothy is an Indian child under ICWA. Bruce had counsel appointed in the first and second adoption cases based on ICWA. The Eberts referred to the initial adoption petition as an "ICWA adoption" in their reply to Bruce's conditional non-opposition to their motion to dismiss. In their trial memorandum for the second adoption case the Eberts wrote that they "concede[d] in their adoption petition that [Timothy] is an

Indian Child as a result of [Connie's] affiliation with the [Tribe]." Connie testified at trial that she is a member of the Tribe, and the Eberts introduced BIA certification that Timothy's bloodline is 25/64 Eskimo. Finally, the Eberts stated in their closing argument and closing brief that ICWA applied as to Connie's parental rights.

It is therefore understandable that in Bruce's trial memorandum regarding the application of ICWA's remedial services clause, he observed "[t]here appears to be no dispute that [Timothy] is an Indian child." It is not clear why the trial court ignored the parties' position that the child is an Indian child and relied on the absence of evidence to decide that Timothy was not an Indian child without giving the parties prior notice and an opportunity to present additional relevant evidence on this issue.

Bruce argues it was clear error to conclude that Timothy is not an Indian child within the meaning of ICWA, noting that "the petitioners repeatedly conceded that [Timothy] was an Indian Child" and "was eligible for membership in an Alaska Native Village" in their second adoption petition and pretrial memorandum. The Eberts stand by the trial court's conclusion, characterize the evidence concerning the Tribe as "scant," and now explain they brought the petition under ICWA only because "it[']s better to be safe than sorry."

 Bruce's argument raises two issues. Were the Eberts' concessions that Timothy is an Indian child binding judicial admissions of fact?[20] If not, given that the parties tried

---

trial court's finding of fact that mother's failure to communicate was without justifiable cause).

17. 25 U.S.C. §§ 1903(1)(ii), 1912(d), (f).

18. *D.J. v. P.C.*, 36 P.3d 663, 673 (Alaska 2001); *see also A.B.M. v. M.H.*, 651 P.2d 1170, 1172 (Alaska 1982) (rejecting argument that "[ICWA] appl[ies] only to custody proceedings involving the removal of Indian children from their homes by nonfamily public and private agencies, not to disputes within the extended family"); B.J. JONES, MARK TILDEN & KELLY GAINES-STONER, THE INDIAN CHILD WELFARE ACT HANDBOOK 37 (2d ed. 2008) ("[I]t is clear from legislative history and case law that [ICWA] governs any proceeding in which the termination of parental rights is a potential disposition." (footnotes omitted)).

19. *In re K.L.J.*, 813 P.2d 276, 279 n. 2 (Alaska 1991) ("While the provision in AS 25.23.050, eliminating the need for consent, is short of an actual adoption, it does terminate a parent's ability to protect his or her parental rights.").

20. A judicial admission "dispens[es] with proof of a fact claimed to be true and is used as a substitute for legal evidence at the trial." *Hayes v. Xerox Corp.*, 718 P.2d 929, 932 (Alaska 1986) (quoting *Kuzmic v. Kreutzmann*, 100 Wis.2d 48, 301 N.W.2d 266, 268 (App.1980)); *accord* BLACK'S LAW DICTIONARY 54 (9th ed.2009) (defining "judicial admission" as "[a] formal waiver of proof that relieves an opposing party from having to prove the admitted fact and bars the party who made the admission from disputing it"); 9 JOHN H. WIGMORE, EVIDENCE § 2588, at 821 (Chad-

the case on the understanding that Timothy is an Indian child, should the trial court have given the parties notice that it would rely on a proof deficiency to conclude otherwise?

The first issue raises difficult questions about the nature of the elements underlying a conclusion that a child is an Indian child and what may be the subject of a judicial admission. 25 U.S.C. § 1903(4) defines an "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." Some of the elements contained in that definition are undeniably factual: whether the person is unmarried, whether the person is under age 18, and whether the person is a parent's biological child. As such, they generally would be susceptible to judicial admission.[21]

Whether a child or either biological parent is a member of a tribe, and whether a child is eligible for membership in a tribe, are more difficult questions to categorize. A statement regarding membership or eligibility for membership might be factual if it refers to

an actual determination by the tribe, and thus may be susceptible to judicial admission.[22] But in the absence of an actual determination by the tribe (or perhaps by the BIA) about membership or eligibility for membership, any generalized statement about membership or eligibility for membership might be a statement of mixed fact and law not susceptible to judicial admission:

> Absent a determination by the tribe as to a child's membership or eligibility for membership, the burden falls on the state court to make an independent determination with the evidence it has before it.... Such a review may require the acquisition of the tribe's organic documents, including the tribal constitution and ordinances governing membership.[23]

Whether Indian child status might be susceptible to judicial admission arose in our 1982 decision *A.B.M. v. M.H.*[24] In that case the biological mother arranged "to give her child up for adoption to her sister and brother-in-law."[25] Because the adoptive parents indicated in an adoption questionnaire that the child was an Indian child, the superior

bourn rev. ed.1981) (noting result of judicial admission is "one party need offer no evidence to prove it and the other is not allowed to disprove it").

**21.** *See Pugliese,* 988 P.2d at 580 (" '[A] judicial admission, to be binding, must be one of fact and not a conclusion of law or an expression of opinion.' " (quoting *Hayes,* 718 P.2d at 931)).

**22.** *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 11.02[2], at 827 (Nell Jessup Newton ed., 2005) ("State court decisions have generally adhered to the basic federal rule that the tribe decides who is a member or eligible for membership. If a tribe determines that a person is a member or citizen of the tribe, the state courts cannot disturb that determination." (footnotes omitted)).

The BIA Guidelines for State Courts provide that a "determination by a tribe that a child is or is not a member of ... or ... eligible for membership in that tribe, or that the biological parent is or is not a member of that tribe is conclusive." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,586, Guideline B.1(b)(i) (Nov. 26, 1979) (hereinafter BIA Guidelines); *accord* JONES ET AL., note 18, above, at 34 ("The guidelines for state court also state that a tribal determination of membership is conclusive."). The BIA Guidelines "have important but not controlling significance" because, although not promulgated as regulations,

they represent the BIA's interpretation of ICWA. *John v. Baker,* 982 P.2d 738, 747 n. 33 (Alaska 1999) (citing *Batterton v. Francis,* 432 U.S. 416, 424–25, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977)). The BIA Guidelines also provide that if a tribe fails to make a determination, then the BIA can make a conclusive determination. BIA Guidelines, 44 Fed.Reg. at 67,586, Guideline B.1(b)(ii). A statement regarding a BIA determination of membership or eligibility for membership might also be factual and susceptible to judicial admission.

**23.** JONES ET AL., note 18, above, at 35 (footnotes omitted); *see also In re Baby Boy Doe,* 123 Idaho 464, 849 P.2d 925, 930 (1993) (stating it is question of law "[w]hether the trial court correctly applied ICWA" by determining child was not eligible for membership because tribe's enrollment director stated he could not determine child's eligibility with certainty in absence of birth certificate or paternity affidavit); *cf. In re C.D.,* 751 N.W.2d 236, 241–42 (N.D.2008) (referring to question of child's Indian child status as "legal determination" after tribe declared child was eligible for membership but did not declare biological mother was member).

**24.** 651 P.2d 1170 (Alaska 1982).

**25.** *Id.* at 1171.

court treated the adoption as an ICWA adoption and provided the mother with relevant ICWA protections.[26] A decree of adoption was entered.[27] Two months later the State became aware of the adoption and discovered that it had not been notified as required by state statute and had been deprived of its opportunity to conduct appropriate home studies.[28] On the State's motion the superior court "vacated the adoption decree and ordered the [State] to conduct [the] home studies."[29] The biological mother then changed her mind about the adoption and petitioned for the child's return to her under ICWA.[30] During later custody proceedings the biological mother moved to summarily establish that ICWA controlled the outcome of the custody dispute.[31] The superior court denied the motion, not on the ground that the child was not an Indian child, but on the ground that ICWA does not apply to private, extended family adoptions; the court then determined, under state law, that the biological mother would not be allowed to withdraw her consent to the adoption.[32]

The primary issue in the biological mother's appeal was whether ICWA applies to private adoptions of Indian children within the extended family, as opposed to the removal of Indian children from their homes by non-family public and private agencies.[33] But during the appeal the adoptive parents also sought affirmance on an alternative ground, asserting for the first time that the child was not an Indian child because there

was "nothing in the record to indicate that [the child] is a member of or eligible for membership in an Indian tribe" or that "[the biological] mother is a member of an Indian tribe."[34] On this issue, we held that in light of the adoptive parents' concessions in the adoption questionnaire that the child was an Indian child affiliated with a specific tribe and that ICWA applied, "they became bound by their judicial admissions in the superior court."[35]

■ At first blush *A.B.M.* seems to mandate a reversal of the trial court's determination that Timothy is not an Indian child because the Eberts' concessions to the contrary throughout the proceedings should constitute judicial admissions. But given our subsequent case law defining the limitation of judicial admissions to purely factual matters[36] and our discussion here regarding the nature of membership or eligibility for membership in a tribe, we clarify that the holding of *A.B.M.* is limited to precluding the adoptive parents from arguing a new position on appeal contrary to a position they had taken in the superior court on an issue not raised to or decided by that court. In this light *A.B.M.* should be seen more as applying judicial estoppel or waiver rather than judicial admission.[37]

Here there was no dispute between the parties regarding Timothy's status as an Indian child. But although there was evidence

26. *Id.*

27. *Id.*

28. *Id.* at 1171–72.

29. *Id.* at 1172.

30. *Id.* Under ICWA, an Indian child's biological parent may petition for return of custody when a final decree of adoption is vacated or set aside. 25 U.S.C. § 1916(a).

31. *A.B.M.,* 651 P.2d at 1172.

32. *Id.*

33. *Id.* We held that ICWA does apply to private adoptions. *Id.* at 1172–74. *See* note 18, above, and accompanying text.

34. *Id.* at 1172, 1174.

35. *Id.* at 1174.

36. *Pugliese,* 988 P.2d at 580; *Hayes,* 718 P.2d at 931.

37. Judicial estoppel bars "a party from contradicting previous declarations made during the same or an earlier proceeding if the change in position would adversely affect the proceeding or constitute a fraud on the court." Black's Law Dictionary 631 (9th ed.2009).

In *Ted W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.,* we did not reach the merits of an argument challenging a father's tribal membership because it was not questioned below and plain error was not present. 204 P.3d 333, 337–38 (Alaska 2009). Although we cited *A.B.M.* in our alternative hold-

to establish that Timothy was under the age of 18 and unmarried, there was no evidence nor specific concession by the Eberts that the Tribe had determined Timothy was a member or eligible for membership in the Tribe. Thus it does not appear that there was a binding judicial admission of Timothy's Indian child status in this case. This then leads us to the issue of the fairness of trial court procedures with respect to determining that Timothy was not an Indian child.

Had it been clear to the parties that Timothy's Indian child status was at issue, then it would have been Bruce's burden to produce the necessary evidence to establish that Timothy was a member of or eligible for membership in the Tribe.[38] Other courts have held that if the requisite party does not come forward with evidence that ICWA applies, it is not error to ignore ICWA's mandates.[39] But given the facts of this case, where the parties did not dispute Timothy's status as an Indian child, it was fundamentally unfair to find Timothy was not an Indian child without first informing the parties that his status was at issue and allowing for presentation of relevant evidence regarding tribal membership issues.

In *Frost v. Spencer* we held that "[b]ecause basic fairness requires an opportunity to present relevant evidence, applying an unanticipated body of law could be an abuse

of discretion if doing so were to make different outcome-determinative facts relevant." [40] In *Frost* we determined a party "made a plausible showing that if she had known before the trial that the case was to be decided under [different] principles, her evidentiary presentation would have been different." [41] We held it was an abuse of discretion to deny her request for a supplemental evidentiary hearing after the trial court announced post-trial that it would apply a body of law other than that under which the parties had agreed to resolve the case.[42]

The reasoning of *Frost* applies here. Because the parties consistently treated Timothy as an Indian child throughout the litigation, we vacate the trial court's determination that he is not, and remand for further proceedings on the sole, unproven factor underlying Timothy's status as an Indian child: whether Timothy is a member or is eligible for membership in the Tribe.

**2. If Timothy is an Indian child, Bruce's failure to establish paternity before the completion of the one-year period of nonsupport and non-communication did not render ICWA § 1912(d) and (f) inapplicable.**

 Bruce argues that the trial court "failed to make required findings and used

---

ing, our decision was based on a determination of waiver. *Id.*

**38.** *See In re Baby Boy Doe,* 849 P.2d at 931 (stating "[t]he party asserting the applicability of ICWA has the burden of producing the necessary evidence for the trial court" to determine whether the child is eligible for tribal membership, where the "state court does not have a conclusive determination from the tribe or the BIA"); *In re M.N.W.,* 577 N.W.2d 874, 876 (Iowa App. 1998) ("Other states have established it is incumbent upon the party asserting applicability of ICWA to prove the child meets the criteria under ICWA."); *In re C.P.,* 181 N.C.App. 698, 641 S.E.2d 13, 16 (2007) ("The burden is on the party invoking [ICWA] to show that its provisions are applicable to the case at issue, through documentation or perhaps testimony from a tribe representative."); *In re A.L.,* 623 N.W.2d 418, 420 (N.D.2001) ("The party asserting the applicability of the I.C.W.A. must produce evidence for the court to decide whether a child is an 'Indian child.'"); *Hofmann v. Anderson,* 176 Or.App. 311, 31 P.3d 510, 512 (2001) ("As the party asserting the applicability of ICWA, father had

the burden to produce sufficient evidence to support a determination that child was an Indian child."); *People ex rel. D.T.,* 667 N.W.2d 694, 699 (S.D.2003) ("[I]t is incumbent upon the party asserting applicability of ICWA to prove the child meets the criteria under ICWA." (citation omitted)); CONFERENCE OF WESTERN ATTORNEYS GENERAL, AMERICAN INDIAN LAW DESKBOOK 580 (4th ed. 2008) ("The proponent of ICWA coverage bears the burden of proving 'Indian child' status ...." (footnote omitted)).

**39.** *E.g., In re C.K.,* 221 S.W.3d 467, 470 (Mo.App. 2007); *In re C.P.,* 641 S.E.2d at 16–17; *In re A.L.,* 623 N.W.2d at 422; *Hofmann,* 31 P.3d at 511–12; *People ex rel. D.T.,* 667 N.W.2d at 699.

**40.** 218 P.3d at 682.

**41.** *Id.* at 684.

**42.** *Id.* at 681–82, 684; *cf. Heustess v. Kelley-Heustess,* 158 P.3d 827, 835 (Alaska 2007) (holding it violated party's right to due process to grant claim first raised in opponent's rebuttal

an incorrect quantum of proof analysis" for the termination of his parental rights due to its failure to apply ICWA. "[T]he termination of parental rights subject to § 1912 of ICWA involves higher evidentiary standards and different protections of the rights of the parent subject to termination than do termination proceedings strictly under state law." [43] Section 1912(d) requires that before parental rights to an Indian child may be terminated, there must be a showing of active but unsuccessful efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." [44] Section 1912(f) requires that for a court to terminate parental rights to an Indian child, it must determine based on "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child." [45]

The Eberts argue that "[Bruce] never became entitled to ICWA's protections due to his delay in establishing paternity." ICWA excludes from the definition of "parent" an "unwed father where paternity has not been acknowledged or established." [46] The Eberts accurately note that a father's liberty interest in his parental rights is less when he fails to legitimate his child. But the House Report on ICWA "states that the qualification

of an unwed father's right 'is not meant to conflict with the decision of the Supreme Court in *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 [ (1972) ].' " [47] *Stanley* and related case law have been interpreted to hold that an unwed father who "manifests an interest in developing a relationship with [his] child" cannot constitutionally be denied parental status based solely on the failure to comply with the technical requirements for establishing paternity. [48]

Courts have looked to state law developed in response to *Stanley* to determine whether paternity has been acknowledged or established under ICWA. [49] A California appellate court has cited case law on acknowledging and establishing paternity for ICWA and concluded that courts have required that the unwed father "take some official action, such as filing a voluntary declaration of paternity, establishing paternity in legal proceedings, or petitioning to have his name placed on the child's birth certificate." [50] For example, blood testing or "voluntarily signing a declaration of paternity at the time of the child's birth, for filing with the birth certificate" are ways to acknowledge or establish ICWA paternity in California. [51] Under New Jersey law, "fil[ing] a written acknowledgement of paternity . . . or initiat[ing] a lawsuit claiming paternity or any other parental rights

testimony without giving party opportunity to present relevant defenses).

**43.** *D.J.*, 36 P.3d at 669.

**44.** 25 U.S.C. § 1912(d).

**45.** *Id.* § 1912(f).

**46.** *Id.* § 1903(9); *see, e.g., A.A.*, 982 P.2d at 258, 262 (stating father who denied paternity was not entitled to active remedial efforts under ICWA until blood test established his paternity because he did not acknowledge paternity before test).

**47.** *In re Child of Indian Heritage*, 111 N.J. 155, 543 A.2d 925, 934 (1988) (quoting H.R.Rep. No. 1386 at 21 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7543); *accord Yavapai–Apache Tribe v. Mejia*, 906 S.W.2d 152, 172 (Tex.App.1995).

**48.** *In re Child of Indian Heritage*, 543 A.2d at 934 (citing *Stanley*, 405 U.S. 645, 92 S.Ct. 1208, *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), and *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct.

549, 54 L.Ed.2d 511 (1978)); *accord Yavapai–Apache Tribe*, 906 S.W.2d at 172.

**49.** *See In re Child of Indian Heritage*, 543 A.2d at 935; *accord In re Daniel M.*, 110 Cal.App.4th 703, 1 Cal.Rptr.3d 897, 900 (2003); *Yavapai–Apache Tribe*, 906 S.W.2d at 172–73; *cf. Jared P. v. Glade T.*, 221 Ariz. 21, 209 P.3d 157, 161 (App.2009) ("[W]e look to state law to determine whether paternity has been acknowledged or established."). Some state courts have also stated that an unwed father may acknowledge or establish paternity pursuant to tribal law. *In re Child of Indian Heritage*, 543 A.2d at 935; *In re Baby Boy D.*, 742 P.2d 1059, 1064 (Okla.1985), *overruled on other grounds by In re Baby Boy L.*, 103 P.3d 1099, 1101 (Okla.2004).

**50.** *In re Daniel M.*, 1 Cal.Rptr.3d at 900 (citing *In re Baby Girl B.*, 67 P.3d 359, 366 (Okla.Civ. App.2003)); *In re Child of Indian Heritage*, 543 A.2d at 936; *Yavapai–Apache Tribe*, 906 S.W.2d at 172–73.

**51.** *Id.* (citing Cal. Fam.Code, §§ 7551, 7571(a)).

prior to the final judgment of adoption" would make an unwed father a parent for ICWA purposes.[52] South Dakota law indicates that "petitioning to enter his name on the child's birth certificate" would make someone an ICWA parent.[53] "[U]nder Texas law, a man [who] execute[s] a voluntary statement of paternity and file[s] a petition for a decree adjudicating him as a parent of the child" has acknowledged his paternity within the contemplation of ICWA.[54]

The Arizona Court of Appeals recently concluded that even though an unwed father had not complied with a state statute giving him 30 days after receiving notice of an adoption petition to serve the mother with notice that he had initiated a paternity proceeding, he had acknowledged paternity for ICWA purposes.[55] The court found the father had made reasonable efforts including: (1) challenging an earlier petition to terminate his parental rights; (2) filing a paternity petition; (3) writing the court a letter acknowledging paternity; and (4) complying with a genetic testing order.[56]

These cases demonstrate that to qualify as an ICWA parent an unwed father does not need to comply perfectly with state laws for establishing paternity, so long as he has made reasonable efforts to acknowledge paternity. Here, Bruce made reasonable efforts to acknowledge paternity in the year before the Eberts filed their second adoption petition, even though he failed to formally legitimate Timothy under state law within that year. Bruce filed an acknowledgment of paternity and an affidavit of paternity with the superior court in the first adoption pro-

ceeding. The master found Bruce had acknowledged paternity for purposes of contesting that petition. Bruce also moved for custody and later for paternity testing. Finally, Bruce filed a separate suit for custody of Timothy.

We hold that even though Bruce did not comply with the Alaska legitimation statute requiring signatures from both parents[57] or complete his legitimization efforts in court within the first year of Timothy's life, he sufficiently acknowledged paternity of Timothy to invoke the application of ICWA. If Timothy is an Indian child, Bruce is a parent under ICWA and is entitled to the protections under §§ 1912(d) and (f) and other applicable provisions.[58]

### B. State Law Issues

Although a parent's consent to adoption is generally required,[59] AS 25.23.050 provides that adoption consent is not required of "a parent of a child in the custody of another, if the parent for a period of at least one year has failed significantly without justifiable cause ... to communicate meaningfully with the child, or ... provide for the care and support of the child as required by law or judicial decree."[60] We have stated that "courts should 'strictly construe AS 25.23.050 in favor of the natural parent.'"[61]

The burden falls on the adoptive parents, in this case the Eberts, to prove by clear and convincing evidence that communication or support did not occur for that one-year period.[62] Once this showing is made, the burden shifts to the biological parent to produce evidence of justifiable cause for the

---

52. *In re Child of Indian Heritage*, 543 A.2d at 936 (citing N.J. Stat. Ann. § 9:17–43a(6), –43d).

53. *Id.* (citing S.D. Codified Laws Ann. §§ 25–6–1.1(2), 34–25–13.2).

54. *Yavapai–Apache Tribe*, 906 S.W.2d at 173 (citing Tex Fam.Code Ann § 13.21(a)).

55. *Jared P.*, 209 P.3d at 160, 162.

56. *Id.*

57. AS 25.20.050(a)(3).

58. *See* notes 10 and 11, above.

59. *In re A.J.N.*, 525 P.2d 520, 521 (Alaska 1974); *see also D.L.J.*, 635 P.2d 834, 837 (Alaska 1981) (quoting *In re K.M.M.*, 611 P.2d 84, 87 (Alaska 1980)) ("[P]arents should not be deprived of the fundamental rights and duties inherent in the parent-child relationship except for 'grave and weighty reasons.'").

60. AS 25.23.050(a)(2).

61. *In re A.F.M.*, 960 P.2d 602, 604 (Alaska 1998) (quoting *S.M.K. v. R.G.G.*, 702 P.2d 620, 623 (Alaska 1985)).

62. *See In re J.M.F.*, 881 P.2d at 1118; *see also D.L.J.*, 635 P.2d at 838.

failure in communication or support.[63] If the biological parent meets the burden of production, the adoptive parents then must show by clear and convincing evidence that the failure in communication or support was without justifiable cause.[64]

Bruce admitted at trial that for the first year of Timothy's life Bruce did not provide any support or have any contact with Timothy. The burden therefore shifted to Bruce to produce evidence of a justifiable cause for nonsupport and noncommunication. The trial court found Bruce "ha[d] not produced 'justifiable cause,'" and thus the burden of persuasion did not shift back to the Eberts at trial.

### 1. Alleged unjustified failure to communicate meaningfully

Bruce contends that because Timothy was too young to appreciate cards, letters, or telephone calls, his only option "was to work through the court." The trial court determined Bruce's "failure to establish paternity d[id] not amount to 'justifiable cause' for the failure to communicate with ... [Timothy]" and that Bruce "did very little to move his custody case forward."

In *D.A. v. D.R.L.*[65] and *S.M.K. v. R.G.G.*,[66] we noted that "we have relaxed" the meaningful communication requirement "in circumstances where the child is too young to read or communicate over the telephone."[67] The Eberts argue that a child's youth should serve to relax the communication requirement only when the adoptive custodian acts improperly, such as "wrongfully den[ying] access to [the] child" as in *S.M.K.* or "potentially creating a hostile environment for the biological parent" as in *D.A.*[68] We noted in *S.M.K.* that the father's family "wrongfully den[ied]" the biological mother physical access to her child,[69] but our conclusion that the child was too young for written or telephonic communication was not dependent on that fact.[70] Nor did *D.A.* involve "arguable 'wrongs'" as the Eberts suggest: there was no determination that it was "wrong" for the child's mother and the prospective step-father to take the child out of Alaska for three months on vacation or for them to be present together when the biological father visited the child.[71] The Eberts are mistaken—we do not require wrongful conduct by the adoptive custodians to relax the meaningful communication standard if a child is too young to read or use the telephone.

The Eberts also question the "reasoning" of *D.A.* and *S.M.K.*, arguing that AS 25.23.050(a)(2) does not make an exception based on the child's age and should instead be interpreted to require the parent to have custody within the first year of the child's life. But the plain language of the statute does not support that argument; it requires the parent to "communicate meaningfully."[72] The "relax[ation] ... of meaningful communication"[73] merely recognizes that it is not unreasonable for a noncustodial parent to conclude that the benefit of written or telephonic communication is limited when a child is too young to read or use the telephone.[74]

■ Regardless of others' efforts to interfere, a parent has a duty to make objectively reasonable efforts to communicate with his child.[75] Seeking the assistance of a court can indicate a parent's interest in preserving

**63.** *In re J.M.F.*, 881 P.2d at 1118.

**64.** *See id.* (citing *D.L.J.*, 635 P.2d at 838).

**65.** 727 P.2d 768 (Alaska 1986).

**66.** 702 P.2d 620.

**67.** *D.A.*, 727 P.2d at 770; *accord S.M.K.*, 702 P.2d at 624–25 (agreeing biological mother was reasonable in believing letters and telephone calls would not result in meaningful communication with three-year-old son from whom she had been separated for two years).

**68.** (Emphasis omitted.)

**69.** 702 P.2d at 625.

**70.** *See id.*

**71.** 727 P.2d at 769–70.

**72.** AS 25.23.050(a)(2)(A).

**73.** *D.A.*, 727 P.2d at 770.

**74.** *S.M.K.*, 702 P.2d at 624.

**75.** *See In re B.S.L.*, 779 P.2d at 1224–26.

his relationship with his child.[76] When Timothy was just two months old, Bruce commenced pro se legal proceedings by moving to be a party in the Eberts' initial adoption case and to be granted custody. On that day he also attempted, though unsuccessfully, to acknowledge paternity of Timothy. When Timothy was almost four months old, Bruce represented himself at a hearing on the initial adoption petition to request custody of Timothy. When Timothy was four-and-one-half months old, Bruce moved for paternity testing with the assistance of court-appointed counsel. He conditioned his non-opposition to the Eberts' dismissal request on paternity testing and physical custody, albeit unsuccessfully. Three days after the master recommended dismissing the initial adoption petition, Bruce filed a pro se custody suit and request for exemption from payment of fees; at that time Timothy was not yet six months old. And on the eve of Timothy's first birthday, Bruce requested a hearing date in his custody suit. Considering that Bruce had the assistance of court-appointed counsel for only a little over one month of this period, he clearly made reasonable efforts to obtain custody and to develop a relationship with his infant son.

On the facts of this case, we hold both that (1) Bruce produced evidence of justifiable cause for his failure to communicate with Timothy, and (2) the Eberts did not meet their burden of proving by clear and convincing evidence that Bruce unjustifiably failed to communicate meaningfully with Timothy for one year. We therefore reverse the trial court's contrary finding on this point.

### 2. Alleged unjustified failure to provide support

Alaska Statute 25.23.050(a)(2) specifically mentions indigency as a justifiable cause for failure to communicate or support.[77] At trial Bruce cited "[l]ack of income" as his justification for not paying child support. The trial court concluded Bruce "ha[d] not produced 'justifiable cause' for the failure to ... support the child," but did not expressly analyze whether Bruce's financial situation qualified as justifiable cause.

Record evidence suggests Bruce might have been unable to provide support for Timothy due to indigence. Bruce's mother testified she had been unable to loan him money for a lawyer when he asked shortly after Timothy's birth and again when the child was six months old. Bruce testified that he was evicted for nonpayment of rent when Timothy was approximately three months old. When Timothy was four months old, counsel was appointed for Bruce in the initial adoption case based on indigence. In his child support guidelines affidavit and request for exemption from paying fees in his custody action, Bruce reported less than $12,000 in annual income. At trial, Bruce testified that his child support obligations were about $4,000 in arrears. Bruce produced W–2 forms and a paycheck stub showing earnings of slightly more than $5,000 in 2007. Finally, Bruce testified he was unemployed between September 2007 and March 2008. In light of this record evidence, it was error to find Bruce had not produced some evidence of justifiable cause for his failure to provide support for Timothy for a one-year period.

Because Bruce produced some evidence of justifiable cause, the burden should then have shifted to the Eberts to "show by clear and convincing evidence that the natural parent's failure to support was without justifiable cause." [78] We therefore reverse the trial court's contrary finding and remand for further proceedings on this issue.

## V. CONCLUSION

We VACATE the termination of Bruce's parental rights and the adoption decree and REMAND for further proceedings consistent with this opinion; we leave issues of interim

---

76. *S.M.K.*, 702 P.2d at 624.

77. *See also In re K.L.J.*, 813 P.2d at 281 (holding it was error for superior court to find indigency was not legitimate justification under AS 25.23.050(a)).

78. *See In re J.M.F.*, 881 P.2d at 1118 (citing *D.L.J.*, 635 P.2d at 838).

custody and visitation to be decided by the superior court.

CARPENETI, Chief Justice, not participating.