641 S.E.2d 13 (2007)
In the Matters of C.P., L.P., and N.P., Minor Children.
No. COA06-1392.
Court of Appeals of North Carolina.
February 20, 2007.
Paul W. Freeman, Jr., Wilkesboro, for petitioner-appellee Wilkes County Department of Social Services.
Tracie M. Jordan, Jefferson, for petitioner-appellee Guardian ad Litem.
Rebekah W. Davis, Raleigh, for respondent-appellant.
WYNN, Judge.
Where an Indian child is involved in a custody proceeding, the Indian Child Welfare Act allows an Indian tribe to intervene to provide for placement with an Indian family or guardian if possible.[1] Here, Respondent-mother contends the trial court erred by failing to continue the case until such time as the Pokagen Band of Potawatomi Indians could intervene. Because Respondent-mother provided no evidence beyond her bare assertions that would prove the Indian Child Welfare Act should apply, we affirm the trial court's order. However, because the trial court failed to make any provisions for visitation between Respondent-mother and the older two children, as required by North Carolina General Statute § 7B-905(c), we remand for further proceedings as to placement and visitation.
According to the Wilkes County Department of Social Services (DSS), Respondent-mother and her three minor children, N.P., L.P., and C.P., have been directly involved in Case Management Services with DSS since 6 January 2006, when DSS substantiated an allegation of inappropriate discipline by Respondent-mother. DSS had earlier investigated, and failed to substantiate, five reports of abuse or neglect concerning Respondent-mother and her children.
At the time of the substantiated report in January 2006, Respondent-mother entered into a case plan with DSS that included family preservation services, child development assessment services for C.P., and mental health assessments for L.P. and N.P. A Certified Family Specialist worked with Respondent-mother and the three children for five weeks, completing the intensive family preservation services on 11 April 2006.
*15 In late April 2006, Respondent-mother brought the three minor children at issue to DSS because of concern over serious bruises on much of C.P.'s body. Respondent-mother was worried that the older two children, L.P. and N.P., might have caused the bruises. The minor children were taken into DSS custody pursuant to an order for nonsecure custody filed on 23 April 2006. On 25 April 2006, DSS filed petitions to have the children adjudicated neglected because Respondent-mother had failed to provide them with proper care, supervision, or discipline. However, on 26 April 2006, blood tests and a doctor report to DSS confirmed that C.P.'s bruising was due to a condition called idiopathic thrombocytopenia, which results in a very low platelet count and means that even a simple fall off of a couch could result in severe bruises.
Nevertheless, on 2 May 2006, DSS substantiated its finding of neglect due to improper care, based largely on concern that Respondent-mother had waited approximately forty-eight hours after finding the bruises to seek medical care for C.P., as she stated that she was afraid DSS would take the children from her custody. Additionally, DSS noted in its petitions that Respondent-mother had on other occasions locked herself in her bedroom to be away from the children, that the two older children were left to act in a parental role for the youngest, and that one of the older children had taken a piece of broken glass to school as a potential weapon and had kept a knife underneath her bed. In its court report for the adjudication and disposition hearing, DSS recommended reunification of the family but stated that returning to Respondent-mother's custody was contrary to the best interests of the children because she does not "ha[ve] the appropriate skills to effectively parent the children."
Prior to the adjudication and disposition hearing, but after a hearing in which the trial court ordered that the children remain in DSS custody, Respondent-mother informed DSS that she and the children might be members of the Pokagen Band of Potawatomi Indians and that the Indian Child Welfare Act might therefore apply to their case. According to Respondent-mother, her own mother is the only person on the maternal side of her family who is not formally affiliated with the tribe. Respondent-mother formally applied for membership to the tribe during the course of the adjudication proceedings. The original hearing date for the proceedings was 5 June 2006, but the trial court allowed two continuances, until 17 July 2006, to allow the tribe time to respond to Respondent-mother's application or to intervene in the adjudication proceedings after they had been informed of the pending neglect action.
The three children were in foster homes from April 2006 until the date of the adjudication and disposition hearing on 17 and 24 July 2006. At that time, the trial court found that the Indian Child Welfare Act did not apply, as Respondent-mother had presented no proof to the court of her tribal membership, nor had the tribe responded in any way to its notice of the neglect action. The trial court concluded that the minor children were neglected juveniles in that they had not received proper care, supervision, or discipline from Respondent-mother. He further concluded that it was contrary to the best interests of the children to be returned to the home of Respondent-mother and instead directed N.P. and L.P. to be placed in their father's home in Arkansas and for C.P. to remain in DSS custody and foster care, as his father was not a suitable placement.
Respondent-mother appeals from that order, arguing that (I) the trial court erred in concluding that the Indian Child Welfare Act did not apply and in failing to continue the hearing until the designated tribe had responded to Respondent-mother's application for membership; (II) the trial court's findings of fact were not supported by competent, clear, and convincing evidence; (III) the trial court's conclusion that the minor children are neglected was not supported by competent, clear, and convincing evidence or its findings of fact; and, (IV) the trial court erred in failing to provide for visitation by Respondent-mother of the minor children N.P. and L.P., as required by law.

I.
First, Respondent-mother argues that the trial court erred in its finding that the *16 Indian Child Welfare Act did not apply to this case, and by failing to continue the case until such time as the Pokagen Band of Potawatomi Indians had responded to the notice of the neglect action. We disagree.
The Indian Child Welfare Act (the "Act"), passed by Congress in 1978, is intended to regulate placement and custody proceedings involving Indian children in order to strengthen and preserve Native American families and culture. See 25 U.S.C. §§ 1901 et seq. (2006). In North Carolina, in order for the Act to apply, a proceeding must first be determined to be a child custody proceeding as defined by the Act itself, and it must then be determined that the child in question is an Indian child of a federally recognized tribe. In re A.D.L., 169 N.C.App. 701, 708, 612 S.E.2d 639, 644, disc. review denied, 359 N.C. 852, 619 S.E.2d 402 (2005). The burden is on the party invoking the Act to show that its provisions are applicable to the case at issue, through documentation or perhaps testimony from a tribe representative. In re Williams, 149 N.C.App. 951, 957, 563 S.E.2d 202, 205 (2002).
According to the Act,
In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. . . . No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: Provided, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding.
25 U.S.C. § 1912(a) (2006). These requirements of notice and time for preparation allow an Indian tribe to intervene in a pending custody proceeding in order to provide for placement with an Indian family or guardian if possible.
Additionally, an "Indian child's tribe shall have a right to intervene at any point in the proceeding" of any State court concerning the foster care placement of an Indian child. 25 U.S.C. § 1911 (2006). The Act further provides that, even after the conclusion of the proceedings, the tribe "may petition any court of competent jurisdiction to invalidate [any action for foster care placement or termination of parental rights under State law] upon a showing that such action violated" the sections of the Act that outline the proper procedures to follow. 25 U.S.C. § 1914 (2006).
Here, the trial court was informed by Respondent-mother, at the first scheduled adjudication and disposition hearing on 5 June 2006, that the Act might apply because she and the children might be members of the Pokagen Band of the Potawatomi Indians. In accordance with the provisions of the Act as to notice, the trial court ordered DSS to notify the tribe of the pending proceedings and their right to intervene, and then continued the hearing until 26 June 2006 to allow time for the tribe to respond. The record contains the letter that DSS sent to the tribe, as well as a signed return receipt indicating its effective delivery. When the hearing reconvened on 26 June 2006, the trial court again continued the case, as the tribe had not yet responded.
When the hearing reconvened again on 17 July 2006, Respondent-mother requested another continuance but was denied. At that point, approximately thirty days had passed since the notification letter from DSS had been signed for at the address of the Pokagen Band in Michigan, with no response or action taken by the tribe. The only evidence offered by Respondent-mother that she and the children were tribe members was her own word; no other documentation was provided. The period of time that had passed exceeded the statutory requirements of the Act, and Respondent-mother failed to sustain her burden of proof to show the Act's applicability to the case at hand. Under these circumstances, we decline to find that the trial court abused its discretion in its finding that the Act did not apply, or in its refusal to continue the case. If the Pokagen Band *17 determines that Respondent-mother and her children are tribe members, the tribe can still intervene at a later date to revisit the placement issues in question. Accordingly, we overrule this assignment of error.

II.
Next, Respondent-mother argues that several of the trial court's findings of fact were not supported by competent, clear, and convincing evidence. Again, we disagree.
In North Carolina, a neglected child is defined in part as "one who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; . . . or who is not provided necessary medical care; . . . or who lives in an environment injurious to the juvenile's welfare[.]" N.C. Gen.Stat. § 7B-101 (2005). When reviewing a trial court's adjudication of a minor child as neglected, this Court must determine whether the trial court's findings of fact are supported by clear and convincing evidence and whether these findings of fact support the trial court's conclusions of law. In re Gleisner, 141 N.C.App. 475, 480, 539 S.E.2d 362, 365 (2000); see also N.C. Gen. Stat. § 7B-805 (2005) (requiring allegations of neglect to be proven by clear and convincing evidence). However, if supported by clear and convincing evidence, the trial court's findings of fact "are deemed conclusive, even where some evidence supports contrary findings." In re Helms, 127 N.C.App. 505, 511, 491 S.E.2d 672, 676 (1997).
Here, Respondent-mother specifically challenges ten of the trial court's twenty-nine findings of fact, including that Respondent-mother delayed taking C.P. for medical treatment for his bruises because of her fear that DSS would take custody of the children, and that the minor children have had other disciplinary and developmental problems while in her care. She argues that the evidence supporting these findings was overly vague and does not meet the clear and convincing standard. However, after a careful review of the record, exhibits, and transcript, we find no merit to this contention.
The DSS court report, the Guardian ad Litem court report, the summary of Family Preservation Services, and testimony from several witnesses at the hearing, including two DSS social workers, all supported the findings of fact challenged by Respondent-mother, even if there was also evidence that could have supported contrary findings. Accordingly, this assignment of error is overruled.

III.
Next, Respondent-mother argues that the trial court's conclusion that the minor children had been neglected was not supported by sufficient, competent, clear, and convincing evidence or findings of fact. We disagree.
Having determined that the trial court's findings of fact were, indeed, supported by clear and convincing evidence, we note that those findings included facts such as Respondent-mother's delay in seeking necessary medical care for C.P. for his bruising and disciplinary, behavioral, and developmental problems displayed by the children while in Respondent-mother's care that were not present after their placement in foster care. Such findings support the conclusion of law that the minor children are neglected, under the statutory definition provided in North Carolina General Statute § 7B-101.
We emphasize, too, that when evaluating whether a child is neglected, the "determinative factors are the circumstances and conditions surrounding the child, not the fault or culpability of the parent; the fact that the parent loves or is concerned about [the] child will not necessarily prevent the court from making a determination that the child is neglected." In re Montgomery, 311 N.C. 101, 109, 316 S.E.2d 246, 252 (1984). The trial court's findings went directly to the living situation of the children while with Respondent-mother, including whether their problems had persisted after being removed from her care. His conclusion of neglect is consistent with those findings but does not suggest Respondent-mother had not made efforts to learn how to better care for the children nor that her neglect of the children was willful. This assignment of error is therefore overruled.

*18 IV.
Finally, Respondent-mother argues that the trial court erred in failing to provide for visitation between Respondent-mother and the two older children, L.P. and N.P., as required by North Carolina General Statute § 7B-905. We agree.
According to North Carolina law, "[a]ny dispositional order under which a juvenile is removed from the custody of a parent, guardian, custodian, or caretaker . . . shall provide for appropriate visitation as may be in the best interests of the juvenile and consistent with the juvenile's health and safety." N.C. Gen.Stat. § 7B-905(c) (2005). Moreover, "where custody is removed from a parent . . . the court shall conduct a review hearing within 90 days from the date of the dispositional hearing," at which he should consider and make written findings of fact regarding, among other issues, "[a]n appropriate visitation plan." N.C. Gen.Stat. § 7B-906(a),(c)(6) (2005); see also In re E.C., 174 N.C.App. 517, 522, 621 S.E.2d 647, 651 (2005). Significantly, "[t]he trial court maintains the responsibility to ensure that an appropriate visitation plan is established within the dispositional order," and cannot leave the question of visitation to the discretion of the appointed guardian. Id. at 522, 621 S.E.2d at 651.
Here, the trial court's order concluded that it was consistent with the welfare of N.P. and L.P. to be placed with their father in Arkansas, and with the welfare of C.P. to remain in his foster care placement. It further concluded that it was consistent with the welfare of all of the children for DSS to "continue to utilize reasonable efforts to eliminate the need for placement of the children." The order decrees that DSS "shall develop a schedule of gradual visitation between [C.P.] and his parents subject to the conditions set forth herein," but no reference is made to visitation between Respondent-mother and N.P. and L.P., once they have been placed with their father in Arkansas. Nor are there any findings or conclusions that state  or even suggest  such visitation would not be in the best interests of N.P. and L.P. or would be otherwise inconsistent with their health and safety.
Furthermore, the record before us does not contain any documentation from the review hearing of N.P. and L.P.'s placement, scheduled for 21 August 2006, so we have no evidence of any findings, conclusions, or orders by the trial court as to visitation for Respondent-mother and the two older children. As such, the trial court essentially left the question of visitation to the discretion of the children's father, an impermissible delegation of that authority. In re Custody of Stancil, 10 N.C.App. 545, 552, 179 S.E.2d 844, 849 (1971). Rather, in the absence of findings that a parent has forfeited her right to visitation or that it is in the child's best interest to deny visitation, "the court should safeguard the parent's visitation rights by a provision in the order defining and establishing the time, place[,] and conditions under which such visitation rights may be exercised." Id.
Because the trial court failed to make any findings that visitation would harm the minor children in question, or to otherwise provide for visitation between Respondent-mother and the children, we remand for further proceedings regarding visitation consistent with this opinion.
Affirmed in part, remanded in part.
Chief Judge MARTIN and Judge McGEE concur.
NOTES
[1] 25 U.S.C. § 1912(a) (2006).