An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-292

NORTH CAROLINA COURT OF APPEALS

Filed: 19 August 2014

IN THE MATTER OF:

H.S., J.S., P.S., III          Swain County
                                    Nos. 10 JT 28-30

Appeal by respondents from order entered 17 December 2013 by Judge Monica Leslie in Swain County District Court. Heard in the Court of Appeals 28 July 2014.

> *Justin B. Greene for petitioner-appellee Swain County Department of Social Services.*
>
> *Richard Croutharmel for respondent-appellant mother.*
>
> *Peter Wood for respondent-appellant father.*
>
> *Parker Poe Adams & Bernstein LLP, by J. William Porter, for guardian ad litem.*

HUNTER, Robert C., Judge.

Respondents, the mother and father of H.S., J.S., and P.S. ("the juveniles"), appeal from an order terminating their parental rights. After careful review, we affirm.

**Background**

The Swain County Department of Social Services ("DSS") first became involved with this family on 8 March 2010 when DSS received a child protective services report alleging that the juveniles came to school with black eyes and bruises. Respondents voluntarily placed the juveniles in a kinship placement with their paternal aunt until June 2010, at which point they returned to live with respondent mother. Respondents entered into a family services case plan which required them to have mental health assessments, parenting classes, anger management counseling, refrain from corporal punishment, transport the juveniles to their counseling appointments, and maintain adequate housing, transportation, and financial support.

On 3 September 2010, DSS filed petitions alleging that the juveniles were neglected due to the respondents' non-compliance with the case plan, including a lack of adequate housing and financial support. On 18 April 2011, the trial court adjudicated the juveniles as neglected. The disposition hearing was held on 13 July 2011. The children were placed in the custody of DSS, and respondents were ordered to comply with their case plans.

At the first permanency planning hearing on 10 January 2012, the trial court found that the juveniles should remain in DSS custody, and the case plan should remain reunification. At the 27 August 2012 permanency planning hearing due to the respondents' non-compliance with the case plan, the court ceased reunification efforts and changed the permanent plan to a concurrent plan of guardianship or adoption.

On 11 March 2013, DSS filed termination of parental rights (TPR) petitions. The petitions alleged that respondents (1) neglected the juveniles, (2) willfully left them in placement outside the home for more than twelve months without showing that conditions were corrected, (3) left the juveniles in placement for more than six months without paying a reasonable portion of the cost of care for the juveniles, and (4) as to father only, did not establish paternity. *See* N.C. Gen. Stat. § 7B-1111(2013). On 17 December 2013, the trial court entered an order terminating the respondents' parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) and (2) as to both respondents, and also (a)(3) as to respondent father only. *See* N.C. Gen. Stat. § 7B-1111(a)(1), (2), and (3)(2013). Respondents appeal.

**Arguments**

Respondents argue that the trial court erred in terminating their parental rights since it did not have subject matter jurisdiction because it had not properly determined whether the juveniles were subject to the Indian Child Welfare Act ("ICWA"). We disagree.

"Whether a trial court has subject-matter jurisdiction is a question of law, reviewed de novo on appeal." *McKoy v. McKoy*, 202 N.C. App. 509, 511, 689 S.E.2d 590, 592 (2010). The district court has "exclusive, original jurisdiction over any case involving a juvenile who is alleged to be abused, neglected, or dependent" and over "[p]roceedings to terminate parental rights." N.C. Gen. Stat. § 7B-200(a) and (a)(4)(2013). However, the ICWA allocates jurisdiction between tribal and state courts as follows:

> (b) . . . In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided*, That such transfer shall be subject to declination by the tribal court of such tribe.

> (c) . . . In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian

custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.

25 U.S.C. § 1911 (2012). An "Indian child" is defined as:

any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian Tribe[.]

25 U.S.C. § 1903(4) (2012).

Here, the applicability of the ICWA was raised when one of the juveniles told his counselor that he was proud of his Indian heritage. The trial court ordered DSS to:

send an ICWA notice to the Bureau of Indian Affairs by July 14, 2013, to place the Bureau on notice in the event that any of the juveniles are eligible for enrollment in any State or Federally recognized Tribe(s). To the extent that any of the juveniles are eligible for enrollment in any State or Federal recognized Tribe(s), all of the ICWA statutes must be complied with.

DSS sent a standard letter of notice to the Bureau of Indian Affairs (BIA) and did not receive a response. The juveniles' guardian ad litem met with respondent father who stated that he was not Native American, and respondent mother who stated that she was part Cherokee. He met with the juveniles' maternal grandmother who stated that she and her family were associated with the Eastern Band of Cherokee Indians. The guardian ad litem gave the Eastern Band of Cherokee Indians' enrollment

office the names of the juveniles' parents, maternal grandparents, and maternal great grandparents. None of them were enrolled members.

At a pre-trial hearing, respondent mother moved to dismiss the TPR petitions stating that DSS had not complied with the trial court's order to investigate the ICWA's applicability. Respondent mother testified that she was not a member of or associated with any specific tribe and had no specific knowledge to that effect. Respondent father testified that he was not a member of any Indian tribe. The trial court denied the motion. The trial court found that "respondent mother did not meet her burden of showing that the Indian Child Welfare Act applied in this matter[.]"

Respondents contend that DSS "assumed an affirmative duty" regarding the ICWA's applicability when the trial court ordered them to investigate. Respondents cite *In re A.R.* in support of their argument that the trial court's order for DSS to investigate shows that it "kn[ew] or ha[d] reason to know that an Indian child [was] involved[.]" *In re A.R.*, ___ N.C. App. ___, ___, 742 S.E.2d 629, 633 (2013). They argue further that DSS did not meet its burden because it failed to comply with the trial court's order since it only sent notice to the regional

BIA office, did not investigate other tribes, and did not offer evidence of correspondence in the record.

In determining whether the ICWA is applicable, "[t]he burden is on the party invoking the Act to show that its provisions are applicable to the case at issue, through documentation or perhaps testimony from a tribe representative." *In re A.R.*, ___ N.C. App. at ___, 742 S.E.2d at 633. The party must show "proof . . . of her tribal membership" or the tribe must respond. *In re C.P.*, 181 N.C. App. 698, 701, 641 S.E.2d 13, 15 (2007). The "equivocal testimony of the party seeking to invoke the Act, standing alone, is insufficient to meet this burden." *In re Williams*, 149 N.C. App. 951, 957, 563 S.E.2d 202, 205 (2002).

We believe the present case is distinguishable from *In re A.R.* In *In re A.R.*, this Court remanded the case back to the trial court because although the respondents had identified a specific tribal heritage, there had been no further investigation. This Court held that:

> The mere belief by respondent-father as to a family connection to a registered Native American group would normally not meet the burden of triggering the ICWA notification, *see id.*, but in this case, based upon the evidence before it, the trial court specifically found as fact that [Wake County Human Services] should conduct an investigation.

*In re A.R.*, ___ N.C. App. at ___, 742 S.E.2d at 633.

Here, the trial court ordered DSS to complete an investigation and DSS complied. However, there was no response from the BIA, and the specific tribe that respondent mother claimed heritage to did not identify any enrolled family members. There is no evidence to support respondent mother's assertion of Indian heritage. Respondents provided no evidence other than respondent mother's "bare assertions" that the ICWA should apply. *In re C. P.*, 181 N.C. App. at 699, 641 S.E.2d at 14. Verbal testimony that her grandfather "had Indian in him" is "insufficient." *See In re Williams*, 149 N.C. App. at 957, 563 S.E.2d at 205. Even though respondent mother initially identified a tribe and DSS complied with a court order to send notice to the BIA, respondents still had the burden of proving that the ICWA was applicable. *In re C.P.*, 181 N.C. App. at 701-03, 641 S.E.2d at 15-17. Respondents' failure to provide any evidence that the ICWA was applicable was sufficient grounds for the trial court to hold that it was not applicable. *In re Williams*, 149 N.C. App at 957, 563 S.E.2d at 205. Therefore, the trial court did not err in finding that respondent mother had not met her burden of showing that the ICWA did apply.

Respondents next argue that the trial court abused its discretion in terminating respondents' parental rights because the juveniles are not likely to be adopted. Respondent father argues specifically that J.S. is unadoptable due to his behavioral problems and because he is not currently placed in an adoptive home. He concedes that P.S. and H.S. live in a potential adoptive placement and that their behavioral problems are manageable. Respondent mother argues that all three boys are not likely to be adopted due to their behavioral problems and the fact that they are living in therapeutic foster homes. We are not persuaded.

Once statutory grounds for termination have been established, the trial court is required to use its own discretion to "determine whether terminating the parent's rights is in the juvenile's best interest." N.C. Gen. Stat. § 7B-1110(a) (2013); *In re Carr*, 116 N.C. App. 403, 407, 448 S.E.2d 299, 301 (1994). When determining whether it is in the juvenile's best interest to terminate the parent's rights, a trial court is required to make written findings regarding these factors:

(1) The age of the juvenile.

(2) The likelihood of adoption of the juvenile.

> (3)   Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4)   The bond between the juvenile and the parent.
>
> (5)   The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6)   Any relevant consideration.

N.C. Gen. Stat. § 7B-1110(a).   "We review the trial court's decision to terminate parental rights for abuse of discretion." *In re Anderson*, 151 N.C. App. 94, 98, 564 S.E.2d 599, 602 (2002).   "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision."   *Chicora Country Club, Inc. v. Town of Erwin*, 128 N.C. App 101, 109, 493 S.E.2d 797, 802 (1997) (internal quotation marks omitted).

In its disposition order, the trial court made the following pertinent findings of fact:

> 5.   That prior to the visits restarting in September of 2013, all three of the juveniles had made significant progress in therapy and their behavior at home and at school had improved.
>
> 6. . . . Once visits resumed with the respondent father and the possibility of visits with the respondent mother were mentioned, the juveniles regressed to their

former negative behaviors.

. . . .

13. That since the visits were stopped with the respondent father, [J.S.] is stabilizing and his violent and angry behaviors have again decreased. His behaviors are more manageable and his grades have improved after dropping during the time of the visits.

14. That [P.S.] and [H.S.] also demonstrated an increase in disruptive and aggressive behaviors . . . during the time they were visiting with the respondent father.

. . . .

20. That both [P.S.] and [H.S]'s grades suffered during that time period as well, however since the visitation has stopped . . . negative behavior has decreased and their grades have also improved.

21. That the visits with the respondent father and the potential visits with the respondent mother triggered these aggressive and violent behaviors for the three boys, and were detrimental to the mental health and well-being of the three boys.

22. That the juveniles' counselor, Mr. O'Neal, believes . . . the behavior of all three boys will continue to improve with continued therapy and staying in the structure of therapeutic foster care for the time being.

23. That . . . not one of the boys has expressed a desire to see their biological parents or . . . expressed missing their biological parents or their biological

family.

24. That [P.S] is 11 years old, [J.S.] is 10 years old, and [H.S.] is 8 years old. The juveniles are still young enough to be successfully adopted.

25. That while all three juveniles have mental health and behavioral issues, all three have demonstrated that with the proper care and therapy the behaviors can improve as they have done over the past year and a half.

26. That since their time in therapeutic foster care, they have become active participants in their families and their behavior problems at school have significantly decreased.

27. That the termination of the parental rights of the respondent parents will aid in the accomplishment of the permanent plan for the juveniles in that it would legally free the juveniles for adoption.

28. That a termination of the parental rights of the respondent parents would further aid in the permanent plan for the juveniles by allowing the juveniles to move forward in their therapy without the worry or concern about Court proceedings and/or that they may have to visit with or return to live with either of the respondent parents.

29. That an improvement in the juveniles' behaviors and ability to bond with and attach to a pre-adoptive family will aid in the accomplishment of the permanent plan.

30. . . . All three of the juveniles have expressed that they have no desire to live with either of their biological parents.

. . . .

32.  That [P.S.] and [H.S.] are very bonded to their foster parents, the [L. family]. Their foster parents are also bonded to them. . . .

33.  That the [L. family] are a potential pre-adoptive placement for the juveniles, but they have not decided whether or not they are willing to adopt [P.S.] and [H.S.]. . . .

34.  That [J.S.] is bonded to his current foster placement, the [W.] family.  [J.S.] trusts the [W. family] and feels safe with them.  They are a potential pre-adoptive placement and have not yet decided whether or not they are willing to adopt [J.S.]. . . .

35.  That the juveniles by their attachments and bond formed to their foster families have demonstrated that they have the ability to form an attachment to potential adoptive parents, under appropriate circumstances.

36.  That although more care will have to be put into finding an adoptive home for these juveniles due to their behavioral issues, these juveniles are adoptable.

37.  That having found previously that two grounds exist for the termination of parental rights of the respondent mother and three grounds for the respondent father by clear, cogent and convincing evidence it is in the best interest of each of these three children that the parental rights of each of the respondent parents be terminated.

Respondent father argues that dispositional findings of fact 27, 28, 29, 34, and 37 are not supported by evidence. Respondent mother argues that dispositional findings of fact numbers 33, 34, and 36 are not supported by evidence. We disagree.

Findings of fact 27, 28, 29, and 37 are supported by the testimony of the juveniles' long-term counselor whom the court considered to be an expert witness. It was his opinion that the juveniles suffered emotional and physical abuse from respondents and that they had no desire to return to them. He also testified that these were the most damaged juveniles he had seen, and if they were reunited with respondents their behaviors would regress even further. His October 2013 report to the court indicated that after family visitation began, the progress all three juveniles had made in therapy had been "forfeited." This demonstrates that the juveniles neither want nor are emotionally or psychologically stable enough to live with either respondent, and that the permanency of termination will help to stabilize the juveniles' severe behaviors so that they are more likely to be adopted.

Findings of fact 33 and 34 are supported by the testimony of both foster parents. J.S. has been placed with the W. family for a year, and H.S. and P.S. with the L. family for a year and

a half. Both placements are familiar with the juveniles' behaviors and highly trained to manage them.

With respect to finding 36, the DSS case worker who had worked with the juveniles for two and a half years stated that they were adoptable because they had shown through their bond to their foster parents that they are capable of attachment. H.S. and P.S. have only had one foster placement, and J.S. has had two. The juveniles are active in their placements and are learning how to behave in a healthy family environment. Since the juveniles were placed in their respective foster homes, their behaviors have improved. The juveniles' therapist testified that when the juveniles do not visit with respondents they make significant progress in their foster homes.

Given the substantial evidence supporting these findings, we cannot agree that the trial court's best interest determination was "manifestly unsupported by reason." *In re A.R.H.B.*, 186 N.C. App. 211, 218, 651 S.E.2d 247, 253 (2007). Furthermore, the trial court is not required to find that a child is adoptable before terminating parental rights. *See In re Norris*, 65 N.C. App. 269, 275, 310 S.E.2d 25, 29 (1983). The trial court did not abuse its discretion in concluding that it was in the juveniles' best interest to terminate the

respondents' parental rights.    Accordingly, we affirm the trial court's order terminating respondents' parental rights.

## Conclusion

Based on the foregoing reasons, we affirm the trial court's order terminating respondents' parental rights.

AFFIRMED.

Judges DILLON and DAVIS concur.

Report per Rule 30(e).